STATE OF NORTH CAROLINA v. DAVE LOUIS GOLDBERG AND STEVE LEKOMETROS.

(Filed 31 January 1964.)

1. **Indictment and Warrant § 4;   Constitutional Law § 28——   Court will not inquire into extent of incompetent evidence before grand jury.**

   The mere fact that the sole witness before the grand jury was an agent of the State Bureau of Investigation and that the agent was not called as a witness upon the trial does not disclose that all of the testimony of the agent was incompetent as hearsay, notwithstanding the agent never talked with the defendants on trial for conspiracy, since the agent might have procured competent testimony in conversations with other of the conspirators and the State might have elected not to have him testify so as to protect his methods or sources of procuring evidence, or for other reasons, and therefore motion to quash the indictment on the ground that the only evidence before the grand jury was incompetent is properly denied, since the court will not inquire into the extent of incompetent evidence before the grand jury and there being no contention that the agent was personally disqualified as a witness.

2. **Bill of Discovery. § 1——**

   There is no common law right of discovery in criminal prosecutions.

3. **Same;   Constitutional Law § 30——**

   Where there is no contention that anything in the files of the State Bureau of Investigation was admitted in evidence and the record shows

that no member of the Bureau testified during the trial, defendants' contention that they were entitled to an inspection of the files of the Bureau in regard to its investigation of the case is untenable, G.S. 114-15, and denial of their petition for such inspection does not violate any of their rights under Art. I, §§ 11, 17 of the Constitution of North Carolina, or under the Fifth, Sixth, Seventh, and Fourteenth Amendments to the Federal Constitution.

**4. Bribery § 3;    Athletic Contests—**

In this prosecution of defendants under G.S. 14-373 on eight indictments containing twenty-nine counts of conspiracy to bribe and bribery of players on a college varsity basketball team, the evidence *is held* sufficient to sustain conviction on all but one count under one indictment as to one defendant and as to all but five counts in another indictment as to the other defendant, and therefore conviction on all other counts is sustained and the judgment on these counts reversed upon defendants' exceptions to the denials of their motions to nonsuit.

**5. Conspiracy § 5—**

The acts and declarations of each conspirator in furtherance of the common design is competent not only against the conspirator making them but also as to each co-conspirator.

**6. Same—**

The introduction by the State of evidence to the effect that one of the defendants stated he was withdrawing from the conspiracy does not render incompetent evidence of subsequent acts and declarations of co-conspirators in furtherance of the common design when the evidence that such defendant had withdrawn from the conspiracy is not unequivocal and the State introduces other evidence tending to show that he had not withdrawn from the conspiracy.

**7. Criminal Law § 98—**

Contradictions in the State's evidence are to be resolved by the jury and not the court.

**8. Criminal Law § 99—**

On motion to nonsuit, the State's evidence must be considered in the light most favorable to it.

**9. Conspiracy § 3—**

A criminal conspiracy is an agreement of two or more persons to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means, and since the agreement itself is the offense no overt act in furtherance thereof is necessary to complete the crime.

**10. Conspiracy § 4—**

Any one or more of a group of conspirators may be tried alone.

**11. Conspiracy § 5—**

A co-conspirator is an accomplice and is a competent witness if he is *compos mentis*.

**12. Criminal Law § 14—**

Our courts have jurisdiction over a conspiracy if any one of the conspirators commits within this State an overt act in furtherance of the common design, even though the conspiracy may have been entered into outside of the State.

**13. Conspiracy § 5;    Criminal Law § 34—**

In a prosecution of defendants for conspiracy to bribe and bribery of college varsity basketball players, evidence tending to show that a co-conspirator had bribed a number of basketball players in other states is competent as tending to show *animus* or intent.

**14. Criminal Law § 91—**

The admission of incompetent evidence will not be held so prejudicial that its later withdrawal cannot cure the error in its admission when the incriminating part of such evidence is amply established by other competent evidence introduced at the trial and the irrelevant part is in no way connected with defendants so as to prejudice them.

**15. Criminal Law § 94—**

The record in this case *is held* to disclose that the questions asked the witnesses by the court were solely for the purpose of clarification of the witnesses' testimony and did not constitute an expression of opinion by the court in violation of G.S. 1-180.

**16. Same—**

In a trial of two defendants on eight indictments containing twenty-nine counts it will not be held for prejudicial error that the court had delivered to the jurors blank tablets for the purpose of enabling them to list the indictments and the counts as recited to them by the court.

**17. Criminal Law § 101—**

The jury may convict a defendant upon the unsupported testimony of an accomplice or a co-conspirator, but it should do so only after scrutinizing the testimony and ascertaining that the witness was telling the truth.

**18. Criminal Law § 161—**

An instruction which is more favorable to defendants than that to which they are entitled cannot be held prejudicial to them on their appeal.

**19. Same—**

A sentence from the charge cannot justify a new trial when the charge read contextually is without prejudicial error.

**20. Criminal Law § 159—**

Assignments of error not brought forward and discussed in the brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

APPEAL by defendants Goldberg and Lekometros from *Clark, J.,* November 1962 Regular Criminal Term of WAKE.

Criminal prosecution tried upon eight indictments, containing twenty-nine counts and taking thirty-four pages of the record to reproduce them,

charging defendants Goldberg and Lekometros and other persons, who were not on trial, with conspiracy to bribe and bribery of certain players of the North Carolina State College basketball team, with intent to influence the play, action and conduct of the players named in the indictments as such players, in eight basketball games played in the State of North Carolina and in the State of South Carolina within the period from 5 December 1959 to 7 January 1961, in violation of G.S. 14-373. The trial court ordered that all of these eight indictments be consolidated for trial. Defendants have no exception to this order. Appellants pleaded not guilty.

After certain motions of nonsuit made by defendants at the close of the State's evidence were allowed, fourteen counts contained in seven indictments Nos. 8139 through 8145, both inclusive, were submitted to the jury as to both defendants. As to the eighth indictment, No. 8149, which contains six counts, defendants' motion for judgment of nonsuit was allowed as to defendant Lekometros, and allowed as to defendant Goldberg on two of its counts and overruled on four of its counts.

This is a summary of the seven indictments and the counts therein submitted to the jury against both defendants:

### INDICTMENT 8139

*Player*
Donald M. Gallagher

*Game*
N. C. State v.
Wake Forest

*Place and Date*
Winston-Salem, N. C.
5 December 1959

Count One:   Conspiracy to bride Donald M. Gallagher.
Count Three:   Bribery of Donald M. Gallagher.

### INDICTMENT 8140

*Player*
Donald M. Gallagher

*Game*
N. C. State v.
South Carolina

*Place and Date*
Columbia, S. C.
8 December 1959

Count One:   Conspiracy to bribe Donald M. Gallagher.

*INDICTMENT 8141*

*Player*
Donald M. Gallagher

*Game*
N. C. State v.
Kansas

*Place and Date*
Raleigh, N. C.
12 December 1959

Count One:   Conspiracy to bribe Donald M. Gallagher.

*INDICTMENT 8142*

*Player*
Donald M. Gallagher

*Game*
N. C. State v.
Dayton

*Place and Date*
Raleigh, N. C.
28 December 1959

Count One:   Conspiracy to bribe Donald M. Gallagher.
Count Three:   Bribery of Donald M. Gallagher.

*INDICTMENT 8143*

*Player*
Donald M. Gallagher

*Game*
N. C. State v.
Duke

*Place and Date*
Durham, N. C.
9 January 1960

Count One:   Conspiracy to bribe Donald M. Gallagher.
Count Three:   Bribery of Donald M. Gallagher.

## INDICTMENT 8144

*Player*
Donald M. Gallagher

*Game*
N. C. State v.
Duke

*Place and Date*
Raleigh, N. C.
9 February 1960

Count One:   Conspiracy to bribe Donald M. Gallagher.
Count Three:   Bribery of Donald M. Gallagher.

## INDICTMENT 8145

*Player*
Donald M. Gallagher
Stanley Niewierowski

*Game*
N. C. State v.
Maryland

*Place and Date*
Raleigh, N. C.
13 February 1960

Count One:   Conspiracy to bribe Donald M. Gallagher.
Count Three:   Bribery of Donald M. Gallagher.
Count Four:   Conspiracy to bribe Stanley Niewierowski.
Count Six:   Bribery of Stanley Niewierowski.

This is a summary of Indictment 8149 and the counts therein submitted to the jury against defendant Goldberg alone:

*Player*

Anton F. P. Muehl-
bauer

Stanley Niewierowski

*Game*

N. C. State v.
Duke

*Place and Date*

Durham, N. C.
7 January 1961

Count One:   Conspiracy to bribe Anton F. P. Muehlbauer.
Count Three:   Bribery of Anton F. P. Muehlbauer.
Count Four:   Conspiracy to bribe Stanley Niewierowski.
Count Six:   Bribery of Stanley Niewierowski.

The jury returned the following verdict:

"Defendants Dave Louis Goldberg and Steve Lekometros, guilty as charged in Cases numbers 8139, the first and third counts; 8140, the first count; 8141, the first count; 8142, the first and third counts; 8143, the first and third counts; 8144, the first and third counts; and 8145, the first, third, fourth and sixth counts.

"Defendant Dave Louis Goldberg guilty as charged in Case Number 8149, the first, third, fourth and sixth counts."

From judgments of imprisonment of each defendant, each defendant appeals.

*Attorney General T. W. Bruton and Deputy Attorney General Harry W. McGalliard for the State.*

*Newsom, Graham, Strayhorn & Hedrick; Bunn, Hatch, Little & Bunn; E. Richard Jones, Jr.; and Josiah S. Murray, III, for defendant appellants.*

PARKER, J.  Before pleading to the eight indictments, defendants Goldberg and Lekometros filed eight separate verified written motions to quash the indictments. Each motion alleges in identical words the same ground to quash, except as to the number of the indictment, and this is the allegation:

"These defendants, Dave Louis Goldberg and Steve Lekometros aver that Bill of Indictment Number 8139 in this cause returned by the Grand Jury was, according to their information and belief, obtained upon incompetent evidence, to wit: hearsay testimony of W. S. Hunt, Jr., Agent of the State Bureau of Investigation, Raleigh, North Carolina. That said indictment returned against the two above-named defendants was solely upon the testimony of W. S. Hunt, Jr. That these defendants have never at any time discussed with W. S. Hunt, Jr., the charges pending against them."

Each motion requests that it be treated as an affidavit. Defendants here offered no other evidence on their motions to quash. The trial court denied each motion, and the defendants here excepted to each denial and assign this as error.

Each indictment set forth in the record indicates that William S. Hunt, Jr., was the only witness sworn by the foreman of the grand jury and examined before it, and that the indictment was returned a true bill. In this State the foreman of every duly organized grand jury has the power to administer oaths to persons to be examined before it as witnesses. G.S. 9-27. Defendants here do not suggest or state that Hunt personally was disqualified to be a witness before the grand jury; they merely state that according to their information and belief his testimony was hearsay, and they have never at anytime discussed with him the charges pending against them. In S. v. Levy, 200 N.C. 586, 158 S.E. 94, Adams, J., for the Court points out the distinction between incompetent evidence and testimony of disqualified witnesses before a grand jury. There is no allegation in defendants' motions that none of the co-conspirators charged in all the indictments with the defendants here had not discussed the charges pending against these defendants with Hunt, or that he had not overheard them talking about the alleged conspiracy in furtherance of the alleged conspiracy and during its pendency. The evidence for the State shows that defendants here and others of their alleged co-conspirators were registered in the Sir Walter Hotel on 9 February 1960 to see the N. C. State-Duke game, and in the hotel they had a conversation about this game, in which conversation Joseph Eugene Greene said he needed some money to give Donald M. Gallagher, a player of the N. C. State basketball team, before the game, and either Lekometros or Goldberg gave Greene a thousand dollars to give Gallagher on the day of this game. Defendants contend that the failure of the State to call Hunt as a witness during the trial demonstrates that all Hunt's testimony before the grand jury was hearsay. This is a non sequitur; the State may have thought it had sufficient evidence without calling Hunt as a witness during the trial or it may have deemed it

proper to keep Hunt off the stand during the trial so as not to disclose how he obtained his information in respect to the charges in the indictments. Defendants have not shown that all the knowledge Hunt had of these cases was incompetent as evidence.

It is a well-settled principle of law in this State that an indictment will not be quashed, on a motion made in apt time, when some of the testimony before the grand jury given by a witness who is not disqualified is competent and some incompetent, because a court will not go into the barren inquiry of how far testimony which was incompetent contributed to the finding of an indictment as a true bill. *S. v. Choate,* 228 N.C. 491, 46 S.E. 2d 476. See also 37 N.C.L.R. 309.

Defendants here contend that the failure to quash the indictments violated their rights under the Fifth Amendment to the United States Constitution. In *Costello v. United States,* 350 U.S. 359, 100 L. Ed. 397, Costello was indicted by a grand jury on a charge of wilfully attempting to evade payment of income taxes; the indictment was based solely upon the evidence of government witnesses having no firsthand knowledge of the transactions upon which they based their computations showing that Costello and his wife had received far greater income than they had reported. Costello was convicted and challenged his conviction on the ground that the indictment was based solely on hearsay evidence and for that reason should have been dismissed. The Supreme Court unanimously held that the indictment was valid. In an opinion by Mr. Justice Black, six members of the Court rested the decision on the ground that neither the Fifth Amendment, in making a grand jury indictment a prerequisite of a federal trial for a capital or otherwise infamous trial, nor justice and the concept of a fair trial, required that indictments be open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury. Mr. Justice Black in his opinion said:

> "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

The assignment of error to the failure of the trial court to quash the indictments is overruled.

Defendants' first assignment of error is:

"The trial Court committed prejudicial and reversible error by denying the defendants' petition for the State Bureau of Investigation to show cause why the reports of the investigations bearing all the indictments listed herein should not be made available to the petitioners for the reason that such investigations and reports were compiled by the State Bureau of Investigations against the petitioners without their knowledge or information. That in order to be prepared to prepare a defense against the charges against them the petitioners were entitled to examine said reports and investigation by authority of North Carolina General Statutes 114-15. That the denial of the trial Court to make such reports and investigation available to these defendants amounts to a violation of their rights guaranteed in Article I, Section 11 and Section 17 of the Constitution of the State of North Carolina, and their rights as guaranteed by the Fifth Amendment, Sixth Amendment, Seventh Amendment and Fourteenth Amendment to the Constitution of the United States of America."

G.S. 114-15 appears in G.S., Ch. 114, Department of Justice, under Art. 4, State Bureau of Investigation. G.S. 114-15 empowers the Director of the State Bureau of Investigation and his assistants, under certain circumstances, to investigate any crime committed anywhere in the State, when such services may be rendered with advantage to the enforcement of the criminal law. G.S. 114-15 specifically states:

"All records and evidence collected and compiled by the Director of the Bureau and his assistants shall not be considered public records within the meaning of § 132-1, and following, of the General Statutes of North Carolina and may be made available to the public only upon an order of a court of competent jurisdiction. Provided that all records and evidence collected and compiled by the Director of the Bureau and his assistants shall, upon request, be made available to the solicitor of any district if the same concerns persons or investigations in his district."

Defendants here in their petition allege that "in order that they be prepared to defend against the charges pending against them, it is necessary that said report of investigation prepared by the State Bureau of Investigation pertaining to the petitioners herein be made available to the petitioners as authorized and contemplated" by G.S. 114-15. The record shows no member of the State Bureau of Investigation testified during the trial. Defendants in their brief do not contend anything in the

files of the Bureau was admitted in evidence against them. Defendants are not seeking an inspection of any documents or articles which form the basis of the charges against them and which are admissible in evidence, e.g., when a defendant is charged with forgery and requests an inspection of the alleged forged document, 23 C.J.S., Criminal Law, sec. 955 (2), b, p. 793-4. What they are seeking is an order permitting them before trial to go on a word-by-word and line-by-line and unlimited voyage of discovery through the files of the State Bureau of Investigation in respect to these cases here, without any allegation on their part that anything therein is the basis of the charges against them and is admissible in evidence against them, in the fervent hope that something might turn up to benefit them, or that thereby they might obtain an inspection of the State's evidence. In the absence of statutes or rules of practice providing otherwise, it is generally held that a defendant is not entitled under such circumstances to an order of inspection. 23 C.J.S., Criminal Law, sec. 955 (1) and (2) ; Wharton's Criminal Evidence, 12th ed., vol. 2, secs. 671 and 672; 17 Am. Jur., Discovery and Inspection, sec. 32.

The common law recognized no right of discovery in criminal cases. *Rex v. Holland,* 4 TR 691, 100 Eng. Reprint 1248; Wharton's Criminal Evidence, 12th ed., vol. 2, sec. 671.

In *United States v. Krulewitch,* 145 F. 2d 76, 156 A.L.R. 337, Judge Learned Hand delivering the opinion said:

> "It is one thing to say that an accused shall in advance of trial have inspection of statements of witnesses taken by the prosecution in preparation of its case; it is another to deny him the benefit of so much of such statements as is shown to be inconsistent with the witnesses' testimony on the stand, and would impeach them."

In *Goldman v. United States,* 316 U.S. 129, 86 L. Ed. 1322, the Court held:

> "A defendant in a criminal case in a Federal court has no absolute right, either at the preliminary hearing or at the trial, to inspect notes and memoranda made by Federal agents during their investigation of the case and afterwards used by them to refresh their recollections prior to testifying in the case, where such notes and memoranda, constituting a part of the government's files, are not themselves introduced in evidence."

In the majority opinion Mr. Justice Roberts wrote: "Where, as here, they are not only the witness' notes but are also part of the Government's files, a large discretion must be allowed the trial judge. We are unwilling to hold that the discretion was abused in this case."

In brief, defendants contend they have an unqualified right to an inspection of all papers and documents, if any, in the files of the State Bureau of Investigation in these cases. There is a fundamental difference between criminal and civil proceedings. In *S. v. Tune*, 13 N.J. 203, 98 A. 2d 881, Vanderbilt, C. J., speaking for the Court said:

> "In criminal proceedings long experience has taught the courts that often discovery will lead not to honest fact-finding, but on the contrary to perjury and the suppression of evidence. Thus the criminal who is aware of the whole case against him will often procure perjured testimony in order to set up a false defense. [Citing authority.] Another result of full discovery would be that the criminal defendant who is informed of the names of all the State's witnesses may take steps to bribe or frighten them into giving perjured testimony or into absenting themselves so that they are unavailable to testify. Moreover, many witnesses, if they know that the defendant will have knowledge of their names prior to trial, will be reluctant to come forward with information during the investigation of the crime. [Citing authority.] All these dangers are more inherent in criminal proceedings where the defendant has much more at stake, often his own life, than in civil proceedings. The presence of perjury in criminal proceedings today is extensive despite the efforts of the courts to eradicate it and constitutes a very serious threat to the administration of criminal justice and thus to the welfare of the country as a whole. [Citing authority.] To permit unqualified disclosure of all statements and information in the hands of the State would go far beyond what is required in civil cases; it would defeat the very ends of justice."

"The burden of showing facts justifying inspection before trial is on the moving party." 23 C.J.S., Criminal Law, sec. 955 (2), c, p. 796.

In our opinion, G.S. 114-15 gives to a defendant in a criminal action no unqualified right to have a court of competent jurisdiction to enter an order permitting him an inspection of "all records and evidence collected and compiled" by the State Bureau of Investigation in a criminal case pending against him, nor do we know of any statute of this State that gives such a right to a defendant in a criminal case, and no such statute has been called to our attention. In our opinion, and we so hold, defendants here have not shown facts which would have warranted the trial court to enter an order in its discretion or as a matter of right allowing them to inspect the files of the State Bureau of Investigation in these criminal cases pending against them as prayed in their petition, and the denial of their petition does not violate any of their rights under Article

I, sections 11 and 17 of the North Carolina Constitution, and under the Fifth, Sixth, Seventh, and Fourteenth Amendments to the United States Constitution. Consequently, their assignment of error to the denial of their petition for inspection is overruled.

Both defendants assign as error the denial of their motions for judgment of nonsuit of indictment 8139 counts one and three, of indictment 8140 count one, of indictment 8141 count one, of indictment 8142 counts one and three, of indictment 8143 counts one and three, of indictment 8144 counts one and three, and of indictment 8145 counts one, three, four, and six, made at the close of the State's evidence; defendants offered no evidence. Defendant Goldberg assigns as error the denial of his motion for judgment of nonsuit of indictment 8149 counts one, three, four, and six, made at the close of the State's evidence.

In all eight indictments Aaron Wagman, Joseph Eugene Greene, Joseph Hacken, Dave Louis Goldberg and Steve Lekometros are charged with a conspiracy to bribe the basketball player or players named in each indictment as having been bribed.

All the indictments and every count therein are based on G.S. 14-373, the relevant part of which on this appeal is as follows: "If any person shall bribe, or offer to bribe, any player in any athletic contest with intent to influence his play, action, or conduct in any athletic contest * * *, such person shall be guilty of a felony."

The only conspirators charged in the indictments on trial were Dave Louis Goldberg and Steve Lekometros. The State's evidence in narrative form appears in 283 pages of the record. Its principal witnesses were the alleged co-conspirators Joseph Eugene Greene and Aaron Wagman, whose testimony appears in 159 pages of the record, and the alleged bribed basketball players Donald M. Gallagher, Stanley Niewierowski, and Anton F. P. Muehlbauer, whose testimony appears in 72 pages of the record. Donald M. Gallagher, a student at North Carolina State College, played basketball on the varsity team from 1956 through 1960. Stanley Niewierowski, a student at North Carolina State College from 1957 until 1961, played on the varsity basketball team. Anton F. P. Muehlbauer, a student at North Carolina State College, played on the varsity basketball team during the 1959-1960 season.

The testimony of the State's witness Aaron Wagman shows these facts: He has been in the business of bribing basketball players since 1957. He and Greene were partners and lived in the same neighborhood in the Bronx, New York. They bribed various basketball players in 1957 and 1958. In the summer of 1959 Joseph Hacken sent them to the Catskill Mountains to talk to some basketball players working there about fixing games, shaving points, and dumping games. Joseph Eugene Greene

testified that while there he met Donald M. Gallagher, a member of the varsity basketball team of N. C. State College who was working at a hotel, and talked to him about shaving points in basketball games for the coming season. In October 1959 Greene, according to the testimony of Donald M. Gallagher, came to Gallagher's home in Raleigh and asked him if he had considered what they talked about earlier in the summer in the Catskill Mountains. Gallagher testified: "I told him I had considered it and that it sounded like a pretty good deal. I was quite in need of money, needed money * * *. He [Greene] stated he could give $1,-000.00 a game to shave points in basketball games for the coming season, and I said that I had considered that and that it sounded like a pretty good deal and he said he would get in contact with me at a later date."

## INDICTMENT 8139

This indictment in brief charges in the first count a conspiracy on the part of Aaron Wagman, Joseph Eugene Greene, Joseph Hacken, Dave Louis Goldberg and Steve Lekometros to bribe Donald M. Gallagher, a student at N. C. State College and a player on its varsity basketball team, with intent to influence his play, action and conduct in a basketball game to be played between N. C. State College and Wake Forest College in Winston-Salem, North Carolina, on 5 December 1959, so as to limit the number of points with respect to which N. C. State College would defeat Wake Forest College in said game, and the third count charges the payment to Gallagher of a bribe of $1,000 with such intent pursuant to the carrying out of the alleged conspiracy.

In support of this indictment the State has the evidence above stated and also evidence to this effect based upon the testimony of Wagman, Greene, and Gallagher: On 5 December 1959 Wagman and Greene flew to Winston-Salem. They were met at the airport by Hacken and Lekometros; Hacken introduced Lekometros to them. A few hours earlier Greene had given Gallagher the point spread in respect to shaving points in the N. C. State College-Wake Forest College game, and had given him $500 and told him he would give him the rest of the money after the game in Columbia, South Carolina, between N. C. State and South Carolina to be played on 8 December 1959—this is the game which gave rise to indictment 8140. Greene testified, "I gave the money to Donald Michael Gallagher for the purpose of shaving points for the Wake Forest-North Carolina State game." Later in Greene's testimony he said he gave the remaining $500 to Gallagher in Columbia, South Carolina, on 8 December 1959. Wagman testified in substance that Hacken or Lekometros gave Greene this $500 in Columbia to give to Gallagher. At the airport Wagman told Lekometros about Gallagher, gave him the

point spread, and said everything was set. After the game Wagman, Greene, Hacken and Lekometros went to a steak house for food. There they discussed the game and Gallagher, and Lekometros, according to the testimony of Wagman, said: "Gallagher in the second half really did a terrific job and they liked the way he worked and he said, 'This kid is going to be real good. We will make a lot of money with this guy this year'." Gallagher's testimony was to the same effect as Greene's as to his having been paid $1,000 on this game—in two payments of $500 each —one $500 payment in Raleigh and the other $500 in Columbia.

The State offered evidence in respect to the conspiracy charged in all the indictments as follows: The morning after the N. C. State College-Wake Forest College game in Winston-Salem on 5 December 1959, Lekometros, Hacken, Wagman, and Greene flew to Washington, D. C. Greene testified in substance that on this trip he talked with Lekometros about future games, and Lekometros gave Wagman and himself some telephone numbers in St. Louis, Missouri, to call to get in touch with him. Wagman testified in substance, except when quoted, that on 10 December 1959 he, in Columbia, South Carolina, talked with Lekometros in St. Louis, Missouri, over long distance telephone, that Lekometros "said his partner wanted Greene and me to come out to St. Louis, that he wanted to meet us, and that he owed us some money for that game" (apparently the Georgia Tech-South Carolina game), and that he would pick us up at the airport. On the following day Wagman and Greene flew to St. Louis, and Lekometros met them at the airport and drove them to the Belair Motel and carried them to a room. Lekometros made a telephone call, and in ten or fifteen minutes a man came in, and Lekometros said, "This is Dave Goldberg." Wagman testified: "As to what transpired in that room that afternoon, well Steve left right then and said he had to go some place and that just left Greene, myself and Dave Goldberg and first of all we had to pick up some money that was due us from the South Carolina game. $4,250.00 was due us from that game."

Wagman then told Goldberg of many players in many colleges and universities that he had arranged with to dump games or shave points and the money each was to receive for such acts, and then testified: "We told Goldberg that we had North Carolina State, and told him about Don Gallagher, told him that Don Gallagher was to get a thousand dollars for each game that was fixed and that Greene and myself were to get a thousand dollars apiece for each game; told him about Tom Scott, an intermediary, that he was supposed to get $250.00 for each game that Don Gallagher would dump. * * * And Dave Goldberg agreed to pay all expenses; and said that we had been paying a lot of money to inter-mediaries and gave us practically a lecture on trying to cut down the

money paid to intermediaries. And that was actually the whole conversation that took place at the Belair Motel. * * * After we finished the discussion, I remember that Dave Goldberg was making a lot of calls over the telephone, long-distance calls, and he was getting a lot of calls, but I don't know who he was talking to, of course. He was talking mostly points on different games and he was asking what the price on certain games was."

Phillip King, a member of the FBI and a witness for the State, after stating that in November or December 1961 he had a conversation with Dave Louis Goldberg about some indictments against Goldberg in North Carolina, testified: "With respect to whether or not he [Goldberg] had given any money to Wagman or Greene, my recollection is that he said that he gave the money to one or the other, Wagman or Greene. The money he gave to these individuals, they in turn gave to basketball player or players. He did say that he was in North Carolina at that time."

## INDICTMENT 8144

The first count in this indictment is similar to the first count in indictment 8139, except that the game was between N. C. State College and Duke University, and the date 9 February 1960. This indictment alleges the game was played in Raleigh. The third count charges the bribery of Donald M. Gallagher, a player on the varsity basketball team of N. C. State College in this game. In support of counts one and three in this indictment, the State has all the evidence of conspiracy above stated and this additional evidence.

Lekometros, Goldberg, Greene and Wagman met in Raleigh on 8 February 1960 for the N. C. State College-Duke University game to be played there 9 February 1960.

Greene testified:

"The next day Steve Lekometros, Dave Goldberg, Aaron Wagman and myself and the other party went outside [the hotel] when we ate and conversed about the North Carolina State game to be played in Raleigh that night. Dave Goldberg said that he wasn't going to get Don to bet the game until later on in the afternoon, real late; and early in the afternoon when the bets first started coming in and the game seems to start to move a point or a point and a half, and it was still very early in the daytime then, and there was a discussion about whether we should go ahead with that game. So I said, 'If you don't want to go ahead with it,' I said, 'Let's forget about the whole thing. I'd just as soon have it that way anyway, I guess,' because I had given the game to another party that day.

"As to whom I had given it to, I had called Joe Hacken in New York. I had gotten the point spread from Goldberg that day. We got the point spread as soon as it came out. North Carolina was a slight favorite but I don't recall just what the point spread was.

"Wagman and Goldberg and Lekometros and myself had a discussion about Don Gallagher that day before the game. We discussed as to whether or not we were going to go for the game, discussed as to whether or not I should go to see Gallagher and give him some money for the game. As a result I did go to see Don Gallagher. I went to see him somewhere over near the bus station here in Raleigh, somewhere in that locality. I gave him at least one thousand dollars, maybe twelve hundred fifty for that game. My reason for giving him that money was for the Duke-North Carolina State game that night. The purpose of giving him the money was for shaving points in the game that night. After I saw Gallagher I returned to see Wagman, Goldberg and Lekometros. When I left to go to see Gallagher they were in the hotel, and I received the money from Dave Goldberg and I went over to give the money to Don Gallagher * * *.

"After I got back, after I left Gallagher, I talked to Goldberg, Lekometros and Wagman about giving Gallagher the money and told them I gave Gallagher the money and that I gave him the point spread on the game."

Wagman testified:

"After my conversation with Sherwood, I went back to the Stafford Hotel and met Steve, Dave and Sammy. I told them that Sherwood didn't want to shave points, that he thought he couldn't lose by 7 points. Goldberg or Lekometros said 'Okeh, we'll go on from here, we'll go to Raleigh for the Duke-North Carolina State game.' There was a Duke-North Carolina State game played in Raleigh on the 9th day of February, 1960. * * *

"They met me at the hotel in Atlanta and from there we drove to the airport in Atlanta, Georgia and flew to Raleigh, North Carolina, and on the way Goldberg and Lekometros and I discussed the North Carolina State-Duke game to be played in Raleigh on the 9th day of February, 1960. Dave said that he wasn't doing too well, that he had lost some money, and he, in fact, said he was doing very badly, and said he wanted to make sure that this next game won, said he would come to the game in person and said he wanted to make sure that everything goes well because he was losing a lot of money. When we got to Raleigh we met Joe Greene at the Sir Walter Hotel. I was

with Sammy, Dave and Steve. We arrived at the Sir Walter Hotel late in the evening, around midnight or close to midnight. This was before the Duke game. Dave, Steve and Sammy registered at the Sir Walter Hotel, but I didn't register. I do not know the name that Dave Louis Goldberg used to sign the register there. I had a discussion with Joe Greene, Dave Goldberg and Steve Lekometros with respect to that game, which actually took place, I think, in the lobby of the Hotel, the Sir Walter. Greene said that he needed some money to give Gallagher before the game, and either Steve or Dave gave Greene a thousand dollars to give Gallagher on the day of the game, the 9th day of February. Greene left us and said that he was going to meet Gallagher and give him the money. Greene later returned and said he gave Gallagher the money and said that Gallagher was going to call him at the room at the Andrew Johnson Hotel, so that Greene could give him the price of the game at some time around 5:00 o'clock in the evening. Goldberg went to eat, all of us went to a cafeteria about a block from the Sir Walter Hotel to eat. Goldberg got the point spread by making a phone call right outside of the Court House, but I don't know where he called to. He made the call at approximately 4:30 or 5:00 o'clock in the afternoon. He stated that the game was very hot and a lot of people were betting against North Carolina State and he thought someone else gave this game out, but he said that it wasn't that hot that we couldn't work the game."

Gallagher testified:

"Approximately the next time I saw Joseph Greene was just prior to our ball game again with Duke which was to be played in Raleigh, North Carolina. That was the game between North Carolina State and Duke University which was played February 9, 1960, in Raleigh, North Carolina.

"Q. Did you see Joseph Eugene Greene prior to that game so as to talk with him?

"A. Yes, Sir, I did. He explained that the point spread was once again either twelve or thirteen points and I have forgotten which.

"And the favorite team once again was Duke. For me to participate my particular job that the game was to be purposely lost, to lose the ball game, to make sure to insure that Duke won the game by at least twelve or thirteen points. He gave me $1,000.00 prior to that game."

### INDICTMENT 8142

This indictment in count one charges a conspiracy to bribe Gallagher in the North Carolina State College-University of Dayton basketball game played in Raleigh on 28 December 1959, and in count three charges bribery of Gallagher. In support of this indictment the State has the evidence of conspiracy above stated and this additional evidence: Greene testified in substance he called Goldberg in St. Louis over long distance telephone from Raleigh, and Goldberg gave him the point spread for this game, that Dayton had to win the game by four points; there were no money arrangements made over the telephone, that was not necessary. Wagman testified he paid Gallagher $1,000 on this game. Gallagher's testimony is to the effect that Greene told him the point spread in this game was three and one-half points and instructed him how he was to play in this game with respect to shooting and missing and laying off on defense. Then Gallagher testified: "He said that if I participated in this he would give me $1,000.00, and he did this."

### INDICTMENT 8143

This indictment in count one charges a conspiracy to bribe Gallagher in the N. C. State College-Duke University basketball game played in Durham on 9 January 1960, and in count three charges the bribery of Gallagher. In support of this indictment the State has the evidence of conspiracy above stated and this additional evidence: Greene testified to the effect that he gave Gallagher $1,000 to shave points in this game. Gallagher testified in effect that he received $1,000 from Greene for his acts in this game.

### INDICTMENT 8145

This indictment in count one charges a conspiracy to bribe Gallagher in the N. C. State College-University of Maryland basketball game played in Raleigh on 13 February 1960, and in count three charges the bribery of Gallagher in this game, and in count four charges a conspiracy to bribe Stanley Niewierowski, a player on the N. C. State College varsity basketball team in this game, and in the sixth count charges the bribery of Niewierowski. This game was played in Raleigh on 13 February 1960, four days after the N. C. State College-Duke University game was played in Raleigh (Indictment 8144), the evidence in which is set forth above. Greene and Wagman met in Miami prior to 9 February 1960. Greene in respect to this meeting testified: "We were making arrangements for the North Carolina State-Maryland game, the South Carolina game at College Park, Maryland, between North Carolina

State and—between South Carolina and Maryland. I talked to Goldberg about that game." Gallagher testified in substance that the day before this State-Duke game Greene arranged a meeting with Niewierowski and himself in Raleigh and told them how to work in this game, how to miss shots, how to slough off on defense, and the point spread, and gave him $1,000 for this game. Niewierowski testified in substance he agreed with Greene to shave points in this game, and Greene gave him $1,250. Sometime after the N. C. State-Maryland game, Greene talked over long distance telephone with Goldberg. He testified: "I asked him for the money for the Maryland-North Carolina State game and I asked him for money for the other game, the Mississippi State game * * *. I asked him to send us four thousand dollars. * * * I can't remember exactly what Goldberg did say." It is true that Greene testified: "After the Duke Game in Raleigh and before the Maryland game I had a conversation with the defendant Goldberg with respect to backing games. * * * Dave said he wouldn't want to back any more games, any more games that we had in the future, said that he would give us a thousand dollars apiece for the games if we would obtain another backer." There is no unequivocal statement in the evidence by Goldberg that he was withdrawing from the conspiracy. Contradictions in the State's evidence are a matter for the twelve. S. v. Simpson, 244 N.C. 325, 93 S.E. 2d 425. Considering all the State's voluminous and interlocking evidence in the light most favorable to it, as we are required to do on a motion for judgment of nonsuit, S. v. Roop, 255 N.C. 607, 122 S.E. 2d 363, we think the State's evidence was sufficient to carry the case to the jury on indictment 8145.

### INDICTMENT 8149

This indictment is in respect to the North Carolina State College-Duke University basketball game on 7 January 1961. The trial judge nonsuited the case set forth in this indictment as to Lekometros. The Attorney General candidly states in his brief that while there is adequate evidence on the part of the State of the bribery of Muehlbauer and Niewierowski, there is an insufficiency of evidence on the part of the State to connect Goldberg with the offenses charged in this indictment. After a close study of; the State's evidence, we concur in the statement by the Attorney General in his brief. The trial court erred in overruling Goldberg's motion for judgment of nonsuit in respect to indictment 8149.

### INDICTMENT 8140

This indictment is based on the N. C. State College-University of South Carolina basketball game in Columbia, South Carolina, on 8 December 1959. The trial court submitted count one in this indictment,

conspiracy to bribe Gallagher, to the jury, but nonsuited the other counts in this indictment alleging the bribery of Gallagher pursuant to the alleged conspiracy. Gallagher testified in respect to this game: "I was not engaged in sloughing or shaving points or dumping that game and I received no money for it." Greene testified to the effect he did not know who the backers were for this game. In our opinion, there is insufficient evidence on the part of the State to support the first count in this indictment, and the trial court erred in overruling defendants' motion for judgment of nonsuit of this indictment.

### INDICTMENT 8141

This indictment is based on the N. C. State College-University of Kansas basketball game in Raleigh on 12 December 1959. The trial court submitted count one in this indictment, conspiracy to bribe Gallagher, to the jury, but nonsuited the other counts in this indictment alleging the bribery of Gallagher pursuant to the alleged conspiracy. In respect to this game, Greene testified in substance as follows: On the visit of Wagman and himself to St. Louis on 10 December 1959, he told Lekometros and Goldberg that Wagman and himself were going down to Raleigh to attempt to obtain Don Gallagher for the University of Kansas-N. C. State College game to be played in Raleigh on 12 December 1959. At that time Greene discussed with Goldberg and Lekometros that Gallagher was supposed to receive $1,100 and Wagman and himself were supposed to get $1,000 apiece minus whatever it cost them. Goldberg said he was going to give them $1,000 apiece for the game. The money for Gallagher was given to them by Goldberg. From St. Louis Wagman and he flew to Raleigh. On the afternoon of the game in Raleigh, he talked with Goldberg over long distance telephone, and Goldberg gave him the point spread, that the University of Kansas was to win by at least two points or one. In Raleigh he tried without success to contact Gallagher by telephone. He could not contact Gallagher, and he notified Goldberg by long distance telephone that he could not contact Gallagher, and Goldberg told him to keep trying. After that he called Gallagher some six or eight times without success. He tried to find him but could not locate him. He then told Goldberg over long distance telephone that he had not been able to locate Gallagher and told Goldberg that he would continue to try to contact him so as to give him the necessary point spread. He called Goldberg again and told him that he had not contacted Gallagher, and Goldberg told him he would have to get in touch with Gallagher no matter what happened. He told Goldberg that he would do everything he could to get in touch with him, and Goldberg said they had already bet money on the game. The evidence shows that Greene did not contact Gallagher and consequently paid Gallagher no money.

A criminal conspiracy is the unlawful concurrence of two or more persons in a wicked scheme—the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means. The conspiracy is the crime and not its execution. *S. v. Whiteside,* 204 N.C. 710, 169 S.E. 711; *S. v. Lea,* 203 N.C. 13, 164 S.E. 737. No overt act is necessary to complete the crime of conspiracy. *S. v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686. "As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed." *S. v. Knotts,* 168 N.C. 173, 83 S.E. 972.

"No formal agreement between the parties to do the act charged is necessary; it is sufficient that the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and to commit the offense charged, although such agreement is not manifested by any formal words, or by a written instrument. If two persons pursue by their acts the same object often by the same means, one performing one part of the act and the other another part of the act, so as to complete it with a view to the attaining of the object which they are pursuing, this will be sufficient to constitute a conspiracy. It is not essential that each conspirator have knowledge of the details of the conspiracy or of the exact part to be performed by the other conspirators in execution thereof; nor is it necessary that the details be completely worked out in advance to bring a given act within the scope of the general plan." 15 C.J.S., Conspiracy, p. 998.

In *S. v. Gibson,* 233 N.C. 691, 65 S.E. 2d 508, the Court said:

"The acts and declarations of each conspirator, done or uttered in furtherance of the common, illegal design, are admissible in evidence against all. [Citing authority.] 'Everyone who enters into a common purpose or design is equally deemed in law a party to every act which had before been done by the others, and a party to every act which may afterwards be done by any one of the others, in furtherance of such common design.' *S. v. Jackson,* 82 N.C. 565; *S. v. Smith,* 221 N.C. 400, 20 S.E. 2d 360; *S. v. Summerlin*—'Hole-in-the-wall' *Case,*—232 N.C. 333, 60 S.E. 2d 322; *S. v. Anderson,* 208 N.C. 771, *loc. cit.* 786, 182 S.E. 643; *S. v. Herndon,* 211 N.C. 123, 189 S.E. 173."

It was permissible to try Lekometros and Goldberg alone on the indictments here. *S. v. Davenport, supra.*

A co-conspirator is an accomplice, and is always a competent witness; assuming of course he is *compos mentis.* 15 C.J.S., Conspiracy, p. 1145.

Our courts have jurisdiction of a prosecution for criminal conspiracy, if any one of the conspirators commits within the State an overt act in furtherance of the common design, even though the unlawful conspiracy was entered into outside of the State. The rationale of this principle of law is that the conspiracy is held to be continued and renewed as to all its members wherever and whenever any member of the conspiracy acts in furtherance of the common design. *S. v. Hicks,* 233 N.C. 511, 64 S.E. 2d 871; *S. v. Warren,* 227 N.C. 380, 42 S.E. 2d 350; *S. v. Lea, supra;* 22 C.J.S., Criminal Law, sec. 136, i, p. 361; 11 Am. Jur., Conspiracy, sec. 23.

The evidence for the State comes from the inside of the conspiracy, and is quite revealing of the corruption of college basketball players by big-time gamblers and of their argot and of their *modus operandi* in betting large sums of money on rigged games. The acts and words of the alleged conspirators in the indictments here done and said in furtherance of the common design of the alleged conspiracy and while it was in operation are so interwoven in the 159 pages of testimony given by the co-conspirators Wagman and Greene that all of them cannot be summarized or quoted without extending this opinion to a burdensome and intolerable length. We have attempted to state the most crucial parts of their testimony. The State's evidence would permit a jury to make these findings: Wagman and Greene were partners and engaged in bribing basketball players. In the summer of 1959 Hacken sent them to the Catskill Mountains to talk to basketball players working there about fixing games, shaving points, and dumping games. There Greene met and talked to Gallagher about shaving points in basketball games for the coming season. In October 1959 Greene came to Gallagher's home in Raleigh and stated he could give him $1,000 to shave points in basketball games for the coming season, and he would contact him later. On 5 December 1959 Wagman and Greene flew to Winston-Salem for the N. C. State College-Wake Forest College basketball game there that night (Indictment 8139). They were met at the airport by Hacken and Lekometros. Hacken introduced Lekometros to them. Greene gave Gallagher $1,000 to shave points in that game. Hacken or Lekometros gave Greene $500 of the $1,000 paid to Gallagher. After the game Lekometros said in the presence of Hacken, Wagman, and Greene: "Gallagher in the second half really did a terrific job and they liked the way he worked * * *. 'This kid is going to be real good. We will make a lot of money with this guy this year'." On 10 December 1959 Lekometros in St. Louis talked with Wagman in Columbia, over long distance telephone, and said his partner wanted Greene and himself to come out to St. Louis, he wanted to meet them. Wagman and Greene went, and Lekometros introduced Dave Louis Goldberg to them as his partner. The conversation they had in St.

Louis is set forth above. That Wagman, Greene, Hacken, Lekometros and Goldberg had entered into a criminal conspiracy to bribe basketball players as early as the summer of 1959, when Wagman and Greene were sent to the Catskill Mountains by Hacken to talk to basketball players about rigging basketball games, and in particular to bribe Gallagher, a player on the varsity team of N. C. State College, with intent to influence his play, action and conduct in basketball games, and that this criminal conspiracy continued and was operative by overt acts in North Carolina during the games alleged in indictments 8139, 8141, 8142, 8143, 8144, and 8145, and actual payment of bribes in furtherance of the common design of the criminal conspiracy to Gallagher as alleged in the third counts of indictments 8139, 8142, 8143, 8144, and 8145, and to Niewierowski in indictment 8145 count six. The trial court correctly overruled appellants' motions for judgment of nonsuit of indictment 8139 counts one and three, of indictment 8141 count one, of indictment 8142 counts one and three, of indictment 8143 counts one and three, of indictment 8144 counts one and three, and of indictment 8145 counts one, three, four, and six.

Appellants' assignments of error in respect to the admission over their objections and exceptions of alleged incompetent and prejudicial evidence, and of questions asked by the trial judge, are set forth in the record in assignments of error beginning with No. 15 and ending with No. 89, and appear in the record on pages 471 through 542. It is manifest that all these assignments of error cannot be discussed *seriatim* without extending this opinion dozens of pages. We shall discuss only the parts of the alleged incompetent and prejudicial evidence set forth with argument in appellants' brief in discussing their assignments of error.

Appellants contend that it was prejudicial error to permit Gallagher to testify that in October 1959 Greene came to his house in Raleigh and said, "he could give $1,000 a game to shave points in basketball games for the coming season, and I said that I had considered that and it sounded like a pretty good deal and he said that he would get in contact with me at a later date," and further prejudicial error to permit Gallagher to testify that after the N. C. State College-Wake Forest College game in Winston-Salem on 5 December 1959 (Indictment 8139) Greene told him "things worked out just fine in the ball game." Just before the last statement, Gallagher testified, "according to Joe Greene everything did go well and he did win on this particular ball game." This evidence was competent and admissible against all the conspirators for the simple reason that they were the acts and declarations of a co-conspirator done and uttered in furtherance of the common, illegal design of the conspiracy between Lekometros, Goldberg, Greene, Wagman, and

Hacken, and during the pendency of the conspiracy, which the State's evidence by independent proof shows was entered into before Greene saw Gallagher in Raleigh in October 1959, and shows that the conspiracy accomplished its illegal purpose of rigging the game and making money for the conspirators.

Appellants further contend that Greene testified that after the State-Duke game in Raleigh on 9 February 1960 (Indictment 8144), and before the State-Maryland game in Raleigh on 13 February 1960 (Indictment 8145), "I had a conversation with the defendant Goldberg with respect to backing games * * *, and Dave said he wouldn't want to back any more games, any more games that we had in the future * * *, if we would go and get another backer, that he, Dave Goldberg, would give us a thousand dollars, would give to Aaron Wagman and myself that amount if we would succeed in getting ourselves another backer to back any games in the future," that this shows Goldberg had withdrawn from the conspiracy, and consequently the testimony of Gallagher and Niewierowski as to the acts and conversations of Greene with them about the State-Maryland game and the testimony of Greene and Wagman about this game (Indictment 8145) were not competent against them and were highly prejudicial. Goldberg's words, as testified to by Greene, are not an unequivocal statement that he was withdrawing from the conspiracy at that time. There is nothing in the evidence to the effect that Lekometros was withdrawing at that time from the conspiracy. Lekometros had introduced Goldberg to Greene and Wagman as his partner, as set forth before in this opinion where evidence is summarized under indictment 8139. There is other evidence in the record that would permit a jury's finding that Goldberg had not withdrawn from the conspiracy at that time, but was still an active participant in it, and the jury accepted that version of the evidence and convicted appellants on indictment 8145, counts one, three, four, and six. Appellants in their brief do not contend Lekometros had withdrawn from the conspiracy before the State-Maryland game (Indictment 8145). Contradictions and inconsistencies in the State's evidence are a matter for the jury. Consequently, in our opinion, this evidence was competent and admissible against appellants, because the evidence in the record would permit a jury to find that they were the acts and declarations of a co-conspirator done and uttered in furtherance of the common, illegal design of the conspiracy between Lekometros, Goldberg, Greene, Wagman, and Hacken, and during the pendency of the conspiracy, which the State's evidence by independent proof shows was entered into by all the conspirators charged in the indictment before the State-Maryland game (Indictment 8145).

Appellants further assign as errors testimony admitted over their objections and exceptions as to the bribery of a number of basketball play-

ers in other states by Greene and Wagman and their rigging of basketball games in other states. All the indictments are based on G.S. 14-373. An essential element of the offense is bribery or offer to bribe with intent to influence the play, action or conduct of a player in any athletic contest. It is necessary for the State to prove this specific intent. Consequently, the evidence of these other briberies is relevant to the purpose and is competent as proof of such intent in the instant cases. Stansbury, N. C. Evidence, sec. 92, Intent.

Appellants also assign as error that the judge over their objections and exceptions admitted in evidence the testimony of A. W. Otwell, an employee of the telephone company, to the effect that certain records were the official records of the telephone company, and admitted these records in evidence showing numbers of long distance telephone calls to St. Louis and various cities; and further admitted in evidence over their objections and exceptions the testimony of E. N. Case, basketball coach at N. C. State College, as to the play in basketball games of Gallagher, Niewierowski, and Muehlbauer and their reputation; and admitted in evidence over their objections and exceptions the testimony of Michael Siegal and Lou Barshak to the effect that they bribed certain players and rigged certain basketball games, which the State did not connect with any of the indictments here or with any of the alleged conspirators here. At the very beginning of the charge to the jury the court instructed the jury that he was striking out the evidence in its entirety of Otwell, Case, Siegal, and Barshak, and the records identified by Otwell and introduced in evidence, and that the jury should not consider this evidence in passing on the guilt or innocence of the defendants on trial. Appellants contend this evidence was incompetent and prejudicial, that its harmful impression on the minds of the jury could not be erased by the court's instruction withdrawing it from their consideration in passing on their guilt or innocence, and that this entitles them to a new trial. They excepted to the judge's withdrawing this evidence from the jury and assign it as error.

Appellants rely on *S. v. Broom,* 222 N.C. 324, 22 S.E. 2d 926. The facts are clearly distinguishable. Broom was charged with murder in two cases. He was convicted by a jury and appealed. During the cross-examination of Broom, the prosecuting officer for the State asked him if he had not been engaged in committing abortions on women and obtaining money for such unlawful acts. This Broom denied. The prosecuting officer for the State showed him certain instruments and asked him if these were not instruments for producing abortions. This the defendant denied. Broom admitted ownership or possession of some of these instruments, but denied that others were his. The instruments were admitted in evi-

dence in behalf of the State over defendant's objections. The court after-wards withdrew the instruments from evidence. This Court held that the impression made upon the jury's minds by these exhibits, improperly in-troduced and tending to degrade and discredit defendant, could not be removed, and awarded a new trial.

Appellants rely on *Gattis v. Kilgo*, 131 N.C. 199, 42 S.E. 584. It is distinguishable. This was an action for libel and slander. In this case a mass of incompetent evidence was introduced. The opinion states: "Some of the ablest lawyers in the State had appearances on either side, and the plaintiff's counsel were allowed in the argument to use a mass of evidence against the defendants totally incompetent, and calculated to arouse passion and prejudice against the defendants, and to obscure the real question at issue." After the argument of counsel on both sides, the court withdrew this incompetent evidence from the jury. There was a ver-dict and judgment for plaintiff. This Court ordered a new trial.

This Court said in *In re Will of Yelverton*, 198 N.C. 746, 153 S.E. 319:

"It is undoubtedly approved by our decisions that the trial court may correct a slip in the admission of isolated or single points of evi-dence by withdrawing such evidence at any time before verdict and instructing the jury not to consider it. [Citing authority.] But this may not be done, without ordering a mistrial, where the inadvert-ence is protracted and injury would result to the appellant by such action. [Citing authority.] 'When we can see that the appellant has been really injured by such action, we will always order a new trial' —Brown, J., in *Parrott v. R. R., supra* [140 N.C. 546, 53 S.E. 432] [Citing authority.].

"On this phase of the case, therefore, the principal question pre-sented resolves itself into an interpretation of the record."

The evidence in this consolidated case is set forth in the record on pages 94 through 376. The testimony of Gallagher, Scott, Greene, and Wagman is set forth on pages 94 through 309. The testimony of Otwell is set forth on pages 310 through 313, of Case on pages 341 through 345, of Barshak on pages 350 through 362, and of Siegal on pages 362 through 365. This evidence was introduced during the last days of the trial.

While the records identified by Otwell show a number of telephone calls from Raleigh to St. Louis and other cities during the basketball games referred to in the indictments, they do not show that any of them were made by appellants. Nor did the State connect them with any in-dictments. It does not seem that Case's testimony as to the play of the named bribed players was prejudicial in the light of testimony by Greene and Wagman of the bribery of these players, and of the testimony of

Gallagher and Niewierowski and Muehlbauer to the effect that they accepted bribes from Greene and their play was influenced thereby. The testimony of Siegal and Barshak was not connected with defendants in any way. It is hard to see how it was prejudicial to appellants.

Was the admission of this evidence such a slip as could be cured by withdrawing it, or was it a fatal inadvertence? There is nothing in the record to show that the prosecuting officer for the State even referred to this evidence in his argument to the jury. While not altogether free from difficulty, a careful perusal of the entire record leaves us with the opinion that appellants have not been really injured by the introduction of this evidence and that the court's withdrawing it from the consideration of the jury should be sustained. *Cauley v. Insurance Co.*, 220 N.C. 304, 17 S.E. 2d 221.

Appellants have numerous assignments of error in respect to the trial judge asking questions of the witnesses, contending that in doing so he expressed an opinion in violation of G.S. 1-180, and that he cross-examined witnesses. All these assignments of error are overruled. A careful study of all the questions asked witnesses by the trial judge leaves us with the opinion that he did not by word or conduct suggest an opinion as to the credibility of any witness in asking questions, that he did not ask any question reasonably calculated to impeach or discredit a witness, that he did not cross-examine any witness, and that all the questions he asked were competent in order to obtain a better understanding or clarification of what a witness said. Frequently in asking a question the judge said he did not understand what the witness had said. All these assignments of error are overruled. *S. v. Perry*, 231 N.C. 467, 57 S.E. 2d 774.

Appellants assign as error the following part of the charge:

"Now, Gentlemen of the Jury, it is not permissible for the Court to give you these bills of indictment or the exhibits so that the jury might have them during its deliberations. Inasmuch as there are eight bills of indictment with a number of counts in some of the cases or bills alleging separate offenses on different dates and at different times it seems to me imperative that you have some way of making an outline of your own, a memorandum of your own, and in the interest of justice in this case and in the furtherance of justice I'm going to hand you these blank tablets or pads for your own use. I'm not requiring any one of you to try to take any notes or make any memoranda whatsoever, but it has occurred to me that you might like at least to make a list of the bills of indictment and the number of counts in each bill as I go through them and read them thus presenting an opportunity for you to do so, and to that

end I'm going to hand you these blank tablets though, as I have said, it is not required of you that you take a single solitary note. The jury must recall all the evidence and must weigh, consider and compare it all. I am not giving you these tablets, this equipment, for the purpose of trying to have you take any notes whatsoever, any memorandum on the instructions of the Court or on the evidence in the case, the evidence that has already been heard by you, but am doing it simply to give you an opportunity to make some memorandum of the bills of indictment themselves so that at least you will have a list of the charges which you must consider in this case. (Whereupon, the presiding Judge handed the blank tablets to the jurors) Now, those of you who will not have these pads may work together in pairs of two, if you wish, and may list these cases, these charges."

In *Cowles v. Hayes,* 71 N.C. 230, the court allowed the jury to copy a memorandum of articles sold and the prices thereof, made out by plaintiff's counsel. This was objected to by defendants. The case states that this memorandum was but the copy of the account proved and admitted in evidence. The Court in affirming said: "It was therefore nothing more than a note of the evidence taken down by a juror, which was not only proper, but often commendable."

Practically all judges and lawyers take notes during a long complicated trial, and it seems that any judge in a complicated trial like this would make a list of the indictments and the counts therein submitted to the jury to aid him in his charge. With eight indictments containing eighteen counts submitted to the jury, it seems that to give them tablets to list these indictments and counts was not improper and not prejudicial to appellants. In our opinion, no prejudice was sustained by appellants in the court's giving the tablets to the jurors pursuant to what he had just before said to them, and this assignment of error is overruled. See *In re Appropriation of Easements for Highway Pur. (Court of Common Pleas of Ohio, Ashtabula County),* 176 N.E. 2d 881; *United States v. Standard Oil Co.,* 316 F. 2d 884. The facts in *Corbin v. City of Cleveland,* 144 Ohio St. 32, 56 N.E. 2d 214, relied on by appellants, are distinguishable.

The charge of the court to the jury is set forth in pages 378 through 465. In respect to this exhaustive charge appellants have brought forward and discussed in their brief only two assignments of error other than the assignment of error to the court's giving tablets to the jury as set forth above.

Appellants assign as error the charge to this effect: The general rule in a conspiracy case is there can be no conviction on the testimony of accomplices alone no matter how many they be if their testimony is not

corroborated apart from the accomplices' testimony. And that immediately thereafter the court instructed the jury: "You may convict on the unsupported testimony of an accomplice or co-conspirator, but that it is dangerous and unsafe to do so." The quoted part of the charge is correct in this State, *S. v. Smith*, 237 N.C. 1, 74 S.E. 2d 291. The preceding part summarized is not the law in this State. This conflicting statement of the law was not prejudicial to appellants, for if the jury had accepted the summarized statement as correct they would have acquitted appellants. This assignment of error is overruled.

The other assignment of error to the charge is a sentence taken out of context. When the charge is read in its entirety, no error is seen. This assignment of error is overruled.

All assignments of error not brought forward and discussed in appellants' brief are deemed abandoned by them. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810.

All appellants' assignments of error are overruled, except that their assignments of error to the denial of their motions for judgment of nonsuit as to indictment 8140, count one, are sustained, and Goldberg's assignment of error to the denial of his motion for judgment of nonsuit as to indictment 8149, counts one, three, four, and six, is sustained.

The result is as follows: In the trial of indictment 8139 counts one and three, of indictment 8141 count one, of indictment 8142 counts one and three, of indictment 8143 counts one and three, of indictment 8144 counts one and three, and of indictment 8145 counts one, three, four, and six, we find No error. In the trial of indictment 8140 count one and of indictment 8149 counts one, three, four, and six, Reversed.