STATE OF NORTH CAROLINA v. RICHARD VIRGIL

No. 37

(Filed 30 January 1970)

1. **Burglary and Unlawful Breakings § 8—     non-burglarious breaking and entering with felonious intent — punishment**

    The crime of non-burglarious breaking and entering with intent to commit a felony is punishable by imprisonment of not less than four months nor more than ten years. G.S. 14-54.

2. **Criminal Law § 138—     credit on prison sentence — previous sentence — confinement awaiting trial**

    While credit must be given for time served under a previous sentence for the same conduct, a defendant is not entitled to credit for time spent in custody while awaiting trial.

3. **·Criminal Law § 138; Convicts and Prisoners § 1—     confinement without bail on capital charge — awaiting trial and retrial — status — credit on subsequent sentence**

    Status of a defendant confined in the county jail on a capital charge without privilege of bail from the date of his arrest until the conclusion of his third trial, the first trial having resulted in a mistrial and defendant's conviction at the second trial having been reversed on appeal, was that of a person under indictment awaiting trial and not that of a prisoner serving a sentence, and time thus spent may not be credited on defendant's subsequent prison sentence.

4. **Criminal Law § 138—     credit on prison sentence — confinement pending appeal**

    Statute requiring credit on a prison sentence for ·all time spent in custody pending appeal is not retroactive. G.S. 15-186.1.

STATE *v.* VIRGIL

5. **Searches and Seizures § 1;    Constitutional Law § 21— unreasonable searches and seizures**

The Constitution prohibits only those searches and seizures which are unreasonable.

6. **Searches and Seizures § 1;    Constitutional Law § 21;    Criminal Law § 84— search without warrant — articles in plain view**

The constitutional guaranty against unreasonable searches and seizures does not prohibit a seizure without a warrant where no search is required and the contraband matter is fully disclosed and open to the eye and hand.

7. **Criminal Law § 84;    Searches and Seizures § 1— search without warrant — article in plain view**

A piece of chrome with bloodstains on it removed from the exterior of defendant's car without a search warrant was lawfully seized and properly admitted into evidence, where the chrome was fully disclosed and open to the naked eye, and no search was required to obtain it, no search warrant being necessary when an article is in plain view.

8. **Searches and Seizures § 1;    Criminal Law § 84— search without warrant — consent**

Officers lawfully searched defendant's room and the interior of his automobile without a warrant where defendant was present and consented to the search of the room and automobile.

9. **Searches and Seizures § 1;    Criminal Law § 84— search by consent — Miranda warnings**

Warnings required by *Miranda* are inapplicable to searches and seizures, and a search by consent is valid despite failure to give such warnings prior to obtaining consent.

10. **Searches and Seizures § 1;    Criminal Law § 84— request to search — warnings**

Officers investigating a crime are not required by the Federal Constitution to preface a request to search premises with advice to the occupant that he does not have to consent to a search, that he has a right to insist on a search warrant, and that fruits of the search may be used as evidence against him.

11. **Criminal Law §§ 106, 114— negative evidence — probative value — comment by court on weight of evidence**

In some cases, where defendant's motion for judgment of nonsuit turns on the sufficiency of certain negative evidence to take the case to the jury, the court must say as a matter of law whether such negative evidence has any probative value, but when the evidence, apart from such negative evidence, is sufficient to take the case to the jury, the trial court may not comment on the weight of evidence, negative or otherwise.

12. **Burglary and Unlawful Breakings § 6— instructions — contentions — credibility and weight of evidence**

In this prosecution for felonious breaking and entering, the trial court

fully and fairly presented the contentions of both parties and correctly left to the jury the credibility, weight and probative value of all the evidence.

**13. Criminal Law § 118— instructions — contentions of the State**

The trial court's statement of the State's contentions was not unfair and prejudicial to defendant where the record discloses evidence from which inferences related by the court as contentions of the State could legitimately, fairly and logically be drawn by the jury.

**14. Criminal Law § 163— objections to review of evidence and statement of contentions**

Objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires so as to afford the trial judge an opportunity for correction; otherwise they are deemed to have been waived and will not be considered on appeal.

**15. Burglary and Unlawful Breakings § 6— instructions — State's burden of proof**

In this prosecution for felonious breaking and entering, the charge of the court properly required the State to prove beyond a reasonable doubt every essential ingredient of the offense and instructed the jurors to acquit defendant if the State failed to so satisfy them.

BOBBITT, C.J., concurring in part and dissenting in part.

SHARP, J., joins in concurring and dissenting opinion.

ON certiorari to the Superior Court of WAKE County to review judgment of *Carr, J.,* at the March 1965 Criminal Session.

On 9 February 1963 at 7:30 a.m. defendant Richard Virgil was arrested, charged with first degree burglary, and placed in the Wake County Jail. The following events have occurred since that date:

1. Defendant was first tried for first degree burglary at the August 1963 Session of Wake Superior Court. The jury was unable to agree and a mistrial was ordered. Defendant remained in jail on the capital charge.

2. Defendant was again tried for first degree burglary at the April 1964 Session of Wake Superior Court. The jury returned a verdict of guilty with recommendation that the punishment be life imprisonment. Judgment was pronounced accordingly and defendant appealed to the Supreme Court. A new trial was awarded for error in the admission of evidence by decision reported in 263 N.C. 73, 138 S.E. 2d 777. Defendant remained in jail on the capital charge.

3. Defendant was tried on the charge of first degree burglary for the third time at the March 1965 Session of Wake Superior Court.

At the close of all the evidence, Judge Carr announced that he would not submit the case to the jury on the charge of first degree burglary but would submit it on the charge of non-burglarious breaking and entering with intent to commit a felony. The jury returned a verdict of guilty on that charge, and on 26 March 1965 defendant was sentenced to prison for a term of nine to ten years. Defendant gave notice of appeal in open court and was allowed ninety days within which to serve statement of case on appeal. Defendant remained in jail in default of an appearance bond of $5000.00.

4. On 6 October 1965 defendant was served with notice that the solicitor would move on 15 October 1965 for an order dismissing his appeal for failure to serve statement of case on appeal in apt time. When the motion to dismiss was heard, defendant was present in person but his court-appointed counsel did not appear and petitioner was not otherwise represented by counsel. An order was entered dismissing the appeal under G.S. 1-287.1 which provides, in pertinent part, that "[w]hen it appears to the superior court that statement of case on appeal to the appellate division has not been served on the appellee or his counsel within the time allowed, it shall be the duty of the superior court judge, upon motion by the appellee, to enter an order dismissing such appeal; provided the appellant has been given at least five (5) days' notice of such motion. . . ."

5. A commitment was issued on 18 October 1965 and defendant has been an inmate of the State Prison System since that date.

6. Pursuant to a mandate from the Supreme Court of North Carolina, a post conviction hearing was conducted on 4 March 1968 to determine whether or not the defendant instructed his counsel to perfect an appeal to the Supreme Court of North Carolina. Petitioner was present in person and represented by counsel. The court found, *inter alia,* that in July 1965, after receiving the transcript, defendant's counsel delivered the transcript to defendant and informed him in person that counsel found no errors in the trial and advised defendant to begin service of his sentence. Counsel had previously obtained an extension of time within which to serve statement of case on appeal. Defendant informed his counsel that he would retain the transcript, confer with his mother, and then contact counsel. He gave his counsel no further instructions with respect to his appeal, and the time for perfecting the appeal expired while defendant still retained the transcript. Defendant sought certiorari from the Supreme Court of North Carolina and from the Supreme Court of the United States; both applications were denied.

7. Thereafter, on 28 July 1969, defendant again petitioned the Supreme Court of North Carolina for certiorari to the Superior Court of Wake Couonty. We allowed the petition, and the case is now before this Court for review on its merits.

## STATE'S EVIDENCE

In the trial before Judge Carr at the March 1965 Criminal Session, the State offered evidence tending to show that on 9 February 1963 at 3:00 a.m. T. W. Matthews was sleeping inside the premises of Matthews & Gentry Service Station and Grocery located in rural Wake County when he was awakened by a tapping noise at one of the outer doors. Shortly thereafter, one Oliver Evans broke a glass panel in an overhead door to the garage portion of the premises, entered the building and, passing through a swinging door, entered the portion of the premises in which Matthews had been sleeping. Matthews stepped into the aisle and was injured when Evans fired ·his shotgun. Matthews returned the fire and injured Evans who, stumbling and falling, left the building and made his way to the ·shoulder of the road where a car approached and stopped. When Evans attempted to get in this car, Matthews "fired a pistol over the top of this car 2 or 3 times," and the car sped away leaving Evans lying on the shoulder of the road.

In response to a call made by Matthews while Evans was entering the building, officers arrived and carried both Matthews and Evans to the hospital. At the hospital, officers went through Evans' personal effects and obtained his name and address. Thereafter, they went to a rooming house located at 204 E. Lenoir Street in Raleigh. They arrived at 7:30 a.m. and were admitted by a woman named Dora Briggs who directed them to Evans' room. There officers found Richard Virgil — who shared the room with Evans — and he gave them permission to search. The room contained two beds and one closet. He said that the bed on the left belonged to' Oliver Evans and the one on the right belonged to him. Virgil said that part of the clothing in the closet belonged to him and part belonged to Oliver Evans. Virgil identified a jacket hanging at the head of one bed and the keys in the pocket as belonging to Evans. Defendant said the keys unlocked the back door of the house. A suitcase containing shirts, pants, socks, underwear, and four pocket handkerchiefs lay on defendant's bed.

Defendant's car, a 1958 cream colored Oldsmobile bearing license number AP-9672, was "pulled in across the sidewalk with the back of the car sitting almost on the sidewalk" and parked ten feet

from the house. Defendant said he owned the car and gave his consent for the officers to "look into the car." Defendant thereupon took his car keys and unlocked the left door and the trunk. Although the officers at this time had not talked to Evans or Matthews and had not been told about a car stopping on the highway and speeding away when fired upon, one of the officers recognized the car as the same one he had seen parked beside the road near the Matthews and Gentry store about 2:00 a.m. on the morning of the crime. Defendant was then placed under arrest and taken to the county jail.

On the night of 11 February 1963 the officers talked with Evans for the first time concerning what happened the night he was shot. In light of the information he gave them, they returned to 204 E. Lenoir Street, examined the exterior of defendant's 1958 Oldsmobile and observed scratches on the right front door "where there was a very clean place that had been wiped off so that it was cleaner than the rest of the car." The clean spot was six to eight inches in diameter "and we observed on the chrome bolting below the door what appeared to be blood." The chrome molding was removed from the car by the officers and taken to the Identification Bureau. After an expert in the field of blood chemistry testified that an analysis of the stains on the chrome showed them to be human blood, the chrome was admitted in evidence and exhibited to the jury over defendant's objection.

The State's evidence further tended to show that 1962 license number AP-9672 was issued by the Motor Vehicles Department to Richard Virgil of Fayetteville for a 1958 Oldsmobile.

Oliver Evans testified that he had pled guilty to burglary of the Matthews and Gentry store on the night of 9 February 1963 for which he is serving time; that he lived in a room at 204 E. Lenoir Street with Richard Virgil for a while; that on the night of 8 February 1963 he, Richard Virgil and Maceo Stephens borrowed a shotgun from one Foster Curtis and bought shells for the gun at a store near the Curtis home; that they returned to Raleigh where the three of them stayed together during the early part of the night and drank whiskey and beer; that they then went in Virgil's car to the Matthews and Gentry store; that he told Virgil he had been wanting to break in it for a long time because there was "a good lot of money there"; that the car was sixty or seventy feet down Highway 401 on the right side of the road when he pulled off his jacket and laid it on the back seat of the car, took the gun and, leaving Virgil and Stephens in the parked car, walked to the store building and circled around it; that Virgil and Stephens promised to remain

nearby and pick him up when he came out, and it was agreed that the money would be divided; that after circling the building he broke the glass in a push-up door near the grease pit and went in; that shortly thereafter he was shot in the stomach; that he went back through the hole in the push-up door and saw a car coming up the road with lights on; that he struggled to the edge of the road, called Richard's name, and said "I'm shot, take me to the hospital"; that he reached for the car which sped off when a pistol began firing; that he doesn't remember anything after he grabbed at the car until he regained consciousness in the hospital; that the jacket with the key and key ring in the pocket which has been offered in evidence belongs to him and is the same jacket he pulled off and placed on the back seat of Virgil's car; that his intestines were shot out of his body and he was holding them in his hand while reaching and grabbing for the car — "I reckon I was bleeding all that time"; that Virgil's car was a light cream colored 1958 Oldsmobile and Virgil was the driver.

Oliver Evans further testified that when he went into the Matthews and Gentry store he had, besides the shotgun, a pair of gloves, a crowbar and a big screwdriver, twelve to fifteen inches long. The officers found the gloves and shotgun in a side ditch between the store and the highway; Evans identified the gloves as his own and the shotgun as the one they borrowed from Foster Curtis.

Evans admitted on cross examination that he had been convicted of first degree burglary and felonious assault for which he received a life sentence in the State Penitentiary and that he was convicted once in Alabama for breaking and entering.

### DEFENDANT'S EVIDENCE

Defendant as a witness in his own behalf testified that on 8 February 1963 he lived at 204 E. Lenoir Street in Raleigh and "was in the process of paying for a 1958 Oldsmobile"; that he was working with Willis Lee, a wallpaper contractor, and worked on the 8th of February until 5:00 p.m. at which time he went home and ate supper; that Oliver Evans, who shared the room with him for a few weeks, went after some whiskey; that Maceo Stephens came to his room before Evans left; that when Evans returned they rode around in defendant's car, saw two girls from Shaw University and agreed to meet them at the Peoples Cafe; that he returned to his room and put on a gray suit and then all three of them (defendant, Stephens and Evans) went to the Peoples Cafe between 8:15 and 8:30 p.m.; that they stayed there until about 9:20 p.m. drinking

whiskey and beer and talking to the girls; that after the girls left he also left and went to Eddie Winston's place where he stayed from 10 until 12 o'clock midnight playing records, talking to girls and dancing; that he left there about 12:30 a.m. and returned to his room ·on E. Lenoir Street; that he parked his 1958 Oldsmobile on the north side of E. Lenoir Street facing west across from the house where he lives; that he locked the car and went to his room and slept until 7:00 a.m. the following morning at which time he arose, put on his work clothes for painting and went to his car; that his car was parked on the same side of the street but he noticed it had been moved and was not in the same spot where he had left it the night before; that he drove to Willis Lee's house on Western Boulevard; that Mr. Lee told him to return home and change into clean clothes because he wanted him to work at the N. C. Bank Building that morning and wanted all his men to be clean; that he returned to his room about 7:30 a.m. and was shaving when officers arrived ten minutes later; that Oliver Evans was not in his bed that morning or the night before; that he left Evans and Maceo Stephens at the Peoples Grill about 9:20 the night before and never saw them again until after he was arrested.

Defendant testified further concerning the two beds and other furniture in the room where he and Evans lived. He stated that his suitcase was on his bed; that he kept clothes in it because he goes to Fayetteville every weekend; that he calls Fayetteville his home.

· Defendant further testified that his sister had three sets of car keys made because he had experienced difficulty in starting his car by turning the switch key; that he had all three sets, keeping one on a chain and the other two in his pocketbook in case he accidentally locked his chain key in the car; that about two weeks before February 8 he gave Oliver Evans a set of keys he had in his billfold so Evans and a girl named Marilyn Jackson could sit in the car; that he had requested the return of his keys but Evans had not returned them.

Defendant further testified that when he went to his room to put on a gray suit before meeting the girls at the Peoples Cafe, Oliver Evans also changed clothes and was not wearing a field .jacket. Defendant emphatically denied that he was with Oliver Evans and Maceo Stephens or with anyone else at the Matthews and Gentry store when it was broken into around 3:00 a.m. on the morning of February 9.

On cross examination defendant admitted that he had been con-·victed of an offense in Chicago for· which he served one year; that

he "pulled an army term, the Air Force"; that in Fayetteville, N. C., he received two sentences of five to seven years for breaking and entering in 1958; that on 20 April 1959 he received a four to five year sentence in Fayetteville for breaking, entering and larceny.

Mrs. Dora Briggs testified that Richard Virgil and Oliver Evans lived at her house on 8 February 1963; that around 4:00 a.m. an officer came to her door asking whether Oliver Evans lived there and inquiring about Evans' car; that she informed the officer Evans didn't drive a car but rode around with Richard Virgil; that the officer asked what kind of car Virgil had and she said it was a light colored Oldsmobile; that she had never seen Oliver Evans drive — that he usually rode with Richard Virgil; that she went to the room to see if Evans was there; that Richard Virgil was there in his bed but Evans was absent; that both Virgil and Evans had a key to the back door of the house; that she had gone to bed early and did not see Virgil come in that night.

Defendant's motion for judgment of nonsuit was denied. The case was submitted to the jury on the charge of non-burglarious breaking and entering with intent to commit a felony, and the jury returned a verdict of guilty. Defendant was sentenced to prison for a term of nine to ten years. From this judgment he appealed to the Supreme Court assigning errors as noted in the opinion.

*King V. Cheek, Samuel S. Mitchell, and Romallus O. Murphy, Attorneys for defendant appellant.*

*Robert Morgan, Attorney General, by William W. Melvin, Assistant Attorney General, and T. Buie Costen, Staff Attorney, for the State.*

HUSKINS, J.

[1] Defendant was convicted of non-burglarious breaking and entering with intent to commit a felony. This is a felony punishable by imprisonment for not less than four months nor more than ten years. G.S. 14-54. Defendant contends the trial court erred in imposing a sentence of nine to ten years *without giving him credit for time already served.* We now examine the validity of that contention.

In *State v. Weaver*, 264 N.C. 681, 142 S.E. 2d 633, at the May 1963 Session of Alamance Superior Court, defendant pled nolo contendere to a charge of felonious assault and a prison sentence of five to seven years was imposed. On 9 May 1963 defendant was com-

mitted to State's Prison to serve said sentence. On 25 September 1964, after a habeas corpus hearing in the United States District Court, the judgment was vacated and the five to seven year sentence set aside. Defendant was returned to the Alamance County Jail to await retrial in default of an appearance bond. Upon retrial at the December 1964 Session of Alamance, defendant was convicted of assault with a deadly weapon, a misdemeanor, for which he received the maximum statutory sentence of two years. G.S. 14-33. Defendant appealed. Held: (1) Defendant's service of sentence from 9 May 1963, the date he was committed to the State's Prison system, until 25 September 1964, the date said sentence was vacated, must be considered as service on the maximum two-year sentence pronounced at the December 1964 Session; and (2) "defendant is not entitled as a matter of right to credit for the period from September 25, 1964 until the date of the judgment pronounced at December 1964 Session. During this period, while in custody in default of bond, defendant was not serving a sentence as punishment for the conduct charged in the bill of indictment." Accord, *Williams v. State,* 269 N.C. 301, 152 S.E. 2d 111; *State v. Foster,* 271 N.C. 727, 157 S.E. 2d 542; *State v. Paige,* 272 N.C. 417, 158 S.E. 2d 522; *State v. Stafford,* 274 N.C. 519, 164 S.E. 2d 371; *North Carolina v. Pearce,* 395 U.S. 711, 23 L. ed 2d 656, 89 S. Ct. 2072. See Annotation, 35 A.L.R. 2d 1283.

**[2, 3]**    Thus North Carolina requires that credit be given for *time served* under a previous sentence for the same conduct but holds that a defendant is not entitled to credit for time spent in custody while awaiting trial. Until the date of his commitment on 18 October 1965, defendant's status was that of a person under indictment awaiting trial and not that of a prisoner serving a sentence. *State v. Weaver, supra.* The fact that defendant was held on a capital charge without privilege of bail from the date of his arrest on 9 February 1963 until the conclusion of his third trial on 26 March 1965 when a $5,000 appearance bond was set pending appeal did not change his status to that of a prisoner serving a sentence. He was simply awaiting trial in the county jail, and time thus spent may not be credited on a subsequent prison sentence.

**[4]**    Recent enactments designed to require credit on a prison sentence for all time spent in custody *pending appeal* are not retroactive and therefore do not apply to this case. G.S. 15-186.1 (1969 cc. 266, 888). Defendant's first assignment of error is overruled.

**[7]**    Defendant assigns as error the admission into evidence of a piece of chrome with bloodstains on it removed from his automobile

STATE *v.* VIRGIL

without a search warrant on 15 February 1963 (State's Exhibit 10). Defendant contends this amounted to an unreasonable search and seizure prohibited by the Fourth Amendment to the Constitution of the United States.

The automobile in question was parked "ten feet from the house and it was pulled across the sidewalk with the back of the car sitting almost on the sidewalk." No interior search of the car was undertaken at the time the chrome was removed. None was necessary. The officers merely inspected its exterior and "observed on the chrome bolting below the door what appeared to be blood." The chrome strip was thereupon removed from the exterior of the car and taken to the Identification Bureau. Expert testimony confirmed the presence of human blood on the chrome.

**[5, 6]** The Constitution prohibits only those searches and seizures which are unreasonable. *Carroll v. United States,* 267 U.S. 132, 69 L. ed 543, 45 S. Ct. 280; *Elkins v. United States,* 364 U.S. 206, 4 L. ed 2d 1669, 80 S. Ct. 1437. "Furthermore, under circumstances requiring no search, the constitutional immunity never arises. This principle is aptly stated in 47 Am. Jur., Searches and Seizures § 20, as follows: 'Where no search is required, the constitutional guaranty is not applicable. The guaranty applies only in those instances where the seizure is assisted by a necessary search. It does not prohibit a seizure without warrant where there is no need of a search, and where the contraband subject matter is fully disclosed and open to the eye and hand.'" *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376. Accord, *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345; *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495; *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25; *State v. Kinley,* 270 N.C. 296, 154 S.E. 2d 95; *State v. Coffey,* 255 N.C. 293, 121 S.E. 2d 736; *State v. Giles,* 254 N.C. 499, 119 S.E. 2d 394.

**[7]** Applying these principles to State's Exhibit 10, we hold that no search warrant was required. The bloodstained strip of chrome on the exterior of defendant's car was fully disclosed and open to the naked eye. No search was required to obtain it. It was legally acquired and properly admitted into evidence.

**[8]** Defendant complains that the officers searched his room and the interior of his automobile on 9 February 1963 without a search warrant and without warning him of his constitutional rights. It suffices to say in that connection, however, that defendant was present and consenting. The record shows that the door to his room was open; that the officers requested permission to search it, "and Virgil said that we could, to go ahead and help ourselves." With respect

to the car, he not only permitted the officers to search it but he himself unlocked the car door and the trunk so they could do so. "An individual may waive any provision of the Constitution intended for his benefit, including the immunity from unreasonable searches and seizures; and where such immunity has been waived and consent given to a search . . ., an individual cannot thereafter complain that his constitutional rights have been violated." *State v. Colson, supra.*

Defendant's further contention that he should have been advised of his constitutional rights (not itemized or otherwise described) before he was asked for consent to search his room and car has not heretofore been considered by this Court. Other jurisdictions, however, have had occasion to deal with the subject.

In *Washington v. Lyons,* 76 Wash. 2d 502, 458 P. 2d 30, the Supreme Court of Washington, in passing on a similar contention, said: "No cases are cited nor have we found any that require officers investigating a crime to preface a request to search premises with a recital to the owner or occupants of their constitutional rights. . . . The courts which have had occasion to deal with this issue have with complete unanimity decided it adversely to the appellant's contention."

**[9, 10]**        Warnings required by *Miranda* are inapplicable to searches and seizures, and a search by consent is valid despite failure to give such warnings prior to obtaining consent. It was so held in *State v. Oldham,* 92 Idaho 124, 438 P. 2d 275; *People v. Trent,* 85 Ill. App. 2d 157, 228 N.E. 2d 535; *State v. McCarty,* 199 Kan. 116, 427 P. 2d 616; *Lamot v. State,* 2 Md. App. 378, 234 A. 2d 615; *State v. Forney,* 182 Neb. 802, 157 N.W. 2d 403, cert. den. 393 U.S. 1044, 21 L. ed 2d 593, 89 S. Ct. 640. We adhere to that view. Furthermore, appellant has cited no decision, nor have we found any, holding that officers investigating a crime are required by the Federal Constitution to preface a request to search premises with *advice* to the occupant that he does not have to consent to a search, that he has a right to insist on a search warrant, and that the fruits of the search may be used as evidence against him.

In *State v. McCarty, supra,* the Supreme Court of Kansas said:

"*Miranda* deals only with the compulsory self-incrimination barred by the Fifth Amendment, not with the unreasonable search and seizure proscribed by the Fourth Amendment. There is an obvious distinction between the purposes to be served by these two historic sections of the Bill of Rights. The Fifth

Amendment prohibits the odious practice of compelling a man to convict himself; the Fourth guards the sanctity of his home and possessions as those terms have been judicially interpreted. An indispensable element of compulsory self-incrimination is some degree of compulsion. The essential component of an unreasonable search and seizure is some sort of unreasonableness.

"No responsible court has yet said, to our knowledge, that before a valid voluntary consent to a search can be given, the person consenting must first be warned that whatever is discovered through the search may be used as evidence against him. We decline to be the first judicial body to espouse so dubious a theory."

The quoted language is appropriate here. We also decline the distinction. Defendant was not in custody at the time, and there was nothing in the circumstances to suggest that his consent to the search was coerced or otherwise involuntary. Defendant's second assignment is overruled.

Finally, defendant contends the learned trial judge committed prejudicial error in the charge by (1) giving undue emphasis to "negative" testimony, (2) deploying evidence favorable to defendant in such manner as to destroy its value, and (3) failing to charge clearly that the State is required to prove beyond a reasonable doubt every necessary ingredient of the crime.

[11, 12]    An extended discussion of the distinctions between positive and negative evidence is not required and could serve no useful purpose here. In *Murray v. Wyatt*, 245 N.C. 123, 95 S.E. 2d 541 (1956), defendants insisted that the trial court, even in the absence of special request, should have instructed the jury concerning the probative value, weight and effect of "negative testimony." Bobbitt, J., now C.J., writing for the Court, said: "In some cases, where defendant's motion for judgment of nonsuit turns on the sufficiency of certain negative evidence to take the case to the jury, the court must say *as a matter of law* whether such negative evidence has *any* probative value. *Johnson & Sons, Inc. v. R. R.*, 214 N.C. 484, 199 S.E. 704. But when the evidence, apart from such negative evidence, is sufficient to take the case to the jury, the rule is that the trial court may not comment on the weight of evidence, negative or otherwise." Accord, *Carruthers v. Railroad*, 218 N.C. 49, 9 S.E. 2d 498; *Rosser v. Bynum*, 168 N.C. 340, 84 S.E. 393. In a charge which fully and fairly presented the contentions of both parties, Judge Carr wisely and correctly left to the jury the credibility, weight and probative value of all the evidence.

[13, 14] Defendant further assigns as unfair and prejudicial the court's statement of the State's contentions. An examination of the record, however, discloses evidence from which inferences related by the court as a contention of the State could legitimately, fairly and logically be drawn by the jury. A statement of a valid contention based on competent evidence is not error. *State v. Ford,* 266 N.C. 743, 147 S.E. 2d 198. Furthermore, it is the general rule that objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires so as to afford the trial judge an opportunity for correction; otherwise they are deemed to have been waived and will not be considered on appeal. *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469; *State v. Butler,* 269 N.C. 733, 153 S.E. 2d 477; *State v. Case,* 253 N.C. 130, 116 S.E. 2d 429; *State v. Rhodes,* 252 N.C. 438, 113 S.E. 2d 917; *State v. Holder,* 252 N.C. 121, 113 S.E. 2d 15; *State v. Shumaker,* 251 N.C. 678, 111 S.E. 2d 878; *State v. Grundler,* 251 N.C. 177, 111 S.E. 2d 1; *State v. Moore,* 247 N.C. 368, 101 S.E. 2d 26; *State v. Saunders,* 245 N.C. 338, 95 S.E. 2d 876.

[15] Defendant's exception to the mandate contained in the charge is without merit. It requires the State to prove beyond a reasonable doubt every essential ingredient of the offense and instructs the jurors to acquit defendant if the State has failed to so satisfy them. This fully complies with the requirements of G.S. 1-180.

Evidence of defendant's guilt is plenary and persuasive. In the trial below we find

No error.

BOBBITT, C.J., concurring in part and dissenting in part.

I concur in that portion of the decision which upholds the trial, verdict and judgment. The judgment upheld, which was pronounced at March 1965 Session of Wake Superior Court, imposed a prison sentence of nine to ten years. Defendant, charged with the capital felony of burglary in the first degree, was confined in Wake County Jail, awaiting trial or retrial, from his arrest on February 9, 1963, until his (third) trial at said March 1965 Session, at which time the charge was reduced to non-burglarious breaking and entering. In my opinion, defendant is entitled to credit for this period when he was confined, without privilege of bond, on the capital charge. I dissent from that portion of the decision which adjudges that defendant is not entitled to such credit.

SHARP, J., joins in this opinion.