STATE OF NORTH CAROLINA v. JAMES RAY HOFFMAN

No. 93

(Filed 31 August 1972)

1. Criminal Law § 106— motion for nonsuit — sufficiency of evidence
   Defendant's motion for nonsuit was properly overruled where there was substantial evidence of all material elements constituting the offense of first degree murder for which the accused was tried.

2. Bill of Discovery § 1— criminal prosecution — common-law right of discovery — list of State's witnesses
   In the absence of a statute requiring the State to furnish it, the defendant in a criminal case is not entitled to a list of the State's witnesses who are to testify against him; there is no such statute in North Carolina.

3. Bill of Discovery § 1— criminal prosecution — statutory discovery procedures — list of State's witnesses
   G.S. 8-74 providing for taking the deposition of an incapacitated defense witness whose name must be given to the court does not entitle defendant in a criminal case to a list of all the State's witnesses.

4. Criminal Law § 91— continuance — witnesses' names omitted from State's list — claim of surprise
   Where defendant claims surprise by reason of the testimony of four witnesses he did not expect to appear, his proper motion is one for continuance and not one to suppress the testimony.

5. Criminal Law § 87; Witnesses § 1— list of State's witnesses — competency of testimony by witness not listed
   In a first degree murder prosecution wherein the State furnished defense counsel a list of State's witnesses before trial, the trial court did not abuse its discretion in allowing four witnesses whose names

---

State v. Hoffman

---

did not appear on the list to testify on behalf of the State, as the testimony of these four could not have taken defendant by surprise, and hence prejudiced him.

**6. Searches and Seizures § 1— search without warrant — reasonable belief that felon concealed in premises — admittance demanded**

Officers' entry and seizure of "plain-view" items from the home of a suspected felon when there are reasonable grounds to believe the felon is concealed therein are not illegal after admittance has been demanded and there has been no response. G.S. 15-44.

**7. Arrest and Bail § 3— arrest without warrant — reasonable grounds — reliable hearsay**

Reasonable grounds for belief can be based upon information given to an officer by another, the source of such information being reasonably reliable.

**8. Searches and Seizures § 1— search without warrant — articles in plain view**

Since officers were lawfully in defendant's home, observation and seizure of a rifle and cartridges in plain view were not in themselves unlawful.

**9. Constitutional Law § 32; Criminal Law § 76— confession — capital crime — right to counsel — determination of indigency**

For purposes of G.S. 7A-457(a) providing that an indigent defendant cannot waive counsel in a capital case, an indigent is defined as one who does not have available, at the time they are required, adequate funds to pay a necessary cost of his defense; hence, defendant's claim that he was an indigent when he waived counsel at the time of his interrogation was untenable as his sworn statement indicated that he had $160.00 in the bank, an amount more than necessary to obtain counsel for defendant's immediate need. G.S. 7A-450(a).

Justice HIGGINS concurring in result.

APPEAL by defendant from *Godwin, S. J.,* 10 May 1971 Special Session of LENOIR.

Defendant was indicted and convicted of the murder of Gene Autry Stocks on 21 October 1970. He appeals the life sentence imposed upon the verdict.

The State's presentation of evidence before the jury was several times interrupted by lengthy *voir dire* hearings before the judge. Testimony tending to show the facts hereinafter set out within brackets was heard by the judge on *voir dire* in the absence of the jury. In each instance the same testimony, in substance, was thereafter heard by the jury.

Defendant offered no evidence, either on *voir dire* or before the jury. The evidence for the State, summarized insofar as possible in chronological order, tended to show:

On 21 October 1970 defendant and his wife were separated. She was living in the home of her daughter, the wife of deceased (Stocks). Earlier in the year, before the Hoffmans separated, in the presence of Mr. and Mrs. Stocks and Mrs. Thelma Barfield, Stocks's mother, defendant accused his wife of having met a man on a trip she had made with the Stocks and Mrs. Barfield. When they all denied this accusation, defendant called them liars and said he was going to kill Stocks. Thereafter, during the following August, defendant told the Stocks and Mrs. Barfield they were "all going to die one of these days in a pile."

On 28 September 1970 defendant followed his wife to the Stocks's home from her work. There he called the women "ugly names" and ignored Mrs. Stocks's request to leave until she called Stocks to come home. Defendant soon returned, however. This time Stocks ordered him away. Defendant told Stocks that he was capable of killing anybody and if Stocks did not stay out of his affairs he was liable to be the next. As he left, defendant said to Stocks, "I'll get you if it is the last thing I ever do." Mrs. Bertie Croombs, a friend of both the Hoffmans and Stocks families, was present and heard this threat.

On the morning of 21 October 1970, Stocks drove Mrs. Hoffman and her daughter, Mrs. Rebecca Moore, to their work at the Dover Garment Factory. Defendant pulled in behind them driving his green 1970, two-door Chevrolet Nova. After telling his wife she would not live to see the next morning, and neither would anyone else who got in his way, he sped away without speaking to Stocks.

Thereafter, sometime after 10:00 a.m., defendant purchased from the Woolco Department Store a .22-caliber Remington rifle, serial No. 2129176, and two boxes of ammunition. The saleslady testified that defendant appeared to be normal in every respect.

About 12:15 p.m. that day, James Foyles, while driving on Dover Road, saw two similar automobiles stopped ahead of him at an intersection, one car about six feet behind the other. A man with a rifle was standing by the left door of the rear car. Foyles saw this door open, a man emerge, take several steps, go into a spin, and fall. This man was Stocks. The man with the rifle then ran to the front car and drove hurriedly away.

Responding to a call instigated by Foyles, the sheriff and other officers arrived at the scene between 12:20 and 12:30 p.m. It was raining at the time. The officers found the door of Stocks's 1969 green Chevrolet Nova open, the motor running, and the windshield wipers operating. There were three bullet holes in the windshield directly in front of the steering wheel, one through the left headlight, one in the driver's headrest, and one had broken the back glass. Stocks, who was lying near the center of the highway, apparently dead, had been shot in the chin, hand, on the left side of his chest, and over the right eye. His shirt was wet with rain and blood.

When the coroner arrived at 1:00 p.m. he pronounced Stocks dead. The body was taken to the morgue at Lenoir Memorial Hospital. Here a .22-caliber bullet was taken from it and, in due course, delivered to the SBI Laboratory in Raleigh. A search of his car and of his person revealed no weapons of any kind on Stocks. Scattered around the automobile the officers found eight empty .22-caliber long-rifle cartridges and one which had not been fired. These bullets, in due course, were also delivered to the SBI Laboratory.

From the scene of the shooting the officers went to Stocks's home, approximately 1.5 miles away. In consequence of information obtained from Mrs. Stocks, about 1:15 p.m., the officers went to defendant's home. Getting no response to their knocks, they left without entering the house.

After further conversations with Mrs. Stocks and Mrs. Hoffman defendant became the prime suspect. From them they learned that defendant was living alone and that his automobile looked to be almost identical with Stocks's. An All Points Bulletin (APB) was issued for defendant and his automobile.

[On the afternoon of 21 October 1970, E. E. Whaley, the owner of the Coastal Plain Detective Agency and Stocks's employer, at their request, was assisting the officers in their search for defendant and his automobile. The road by defendant's house was being patroled periodically, but the house was not under constant surveillance. Between 3:30 and 4:00 p.m., as Whaley drove past defendant's home, he saw a "swishing movement" of the curtains at a back window. They were "going together and dangling." He immediately radioed this information to the Sheriff's Department, and, in about five minutes,

State v. Hoffman

the sheriff, two of his deputies, and SBI Agent Campbell arrived.]

[About 4:00 p.m., after knocking loudly and "hollering" to defendant to come out, the sheriff entered by the unlocked back door as his Deputy Garris entered by the front door, also unlocked.]

[While searching for defendant, in plain view in the kitchen the officers saw a Remington carton such as would encase a new rifle and several unused .22-caliber, long-rifle cartridges. Inside the front bedroom, also in plain sight they observed standing in the corner a .22-caliber Remington semi-automatic rifle, serial No. 2129176. From the rifle SBI Agent Campbell removed five cartridges. A thorough search of the house and grounds satisfied the officers that defendant was not there. As they left they saw 15-20 spent cartridges in the backyard.]

Defendant was arrested between 8:30 and 9:00 a.m. on the morning of 22 October 1970 by a highway patrolman, and Officer Garris promptly obtained and served upon defendant a warrant charging him with the murder of Stocks. A search of defendant's person disclosed a sales slip from Woolco Department Store showing a purchase in the amount of $59.08. [Thereafter, between 9:00 and 11:00 a.m. Deputy Sheriff Garris and SBI Agent Campbell each talked separately to defendant. Before doing so, each advised defendant he had the right to remain silent and make no statement whatever; that anything he said could, and would be, used against him in court; that he had the right to talk to a lawyer and secure his advice before he was questioned and to have him, or anyone else he wanted, present while he was being questioned; that if he was unable to employ a lawyer before he was questioned one would be appointed to represent him at State expense; that he could exercise his rights at any time and refuse at any time to answer any question or make any statement. Defendant told both Garris and Campbell that he understood his rights; that he wished to talk. When asked specifically if he wanted a lawyer he said he did not and was ready to talk without one. Neither Garris nor Campbell threatened defendant nor offered him any inducement to talk. He appeared to each to be sober and in possession of all of his faculties, and he made intelligent and coherent replies. At no time during questioning did he indicate a desire to remain silent or request counsel.]

In substance, defendant made the following statement to Garris and Campbell: On 21 October 1970, after a beer for breakfast at 6:30 a.m., he reported to the construction company for which he worked but, because of rain, there was no work. About 7:30 a.m., he drove to the Dover Garment Factory where he talked momentarily with his wife in the presence of Stocks and another person. He told her she was going to get killed if she kept on living the life she was, and from there he went to his residence, where he stayed until 9:00 a.m. and then went to Woolco Shopping Center. After cashing a check for $100.00 at the Wachovia Bank he went to Woolco Department Store where he bought a .22-caliber rifle and two boxes of .22-caliber ammunition shortly after the store opened. Returning to his residence he made practice shots at pine cones in the backyard with the rifle he had purchased. He then set the weapon behind the bed, took two beers from the refrigerator, got into his car and set out for Oriental. He ate lunch at a cafe about ten miles from Bridgeton. At Oriental he failed to find the paving crew which was supposed to be working there; so he went to a motel on Highway 17, where he spent the night. The next morning, about 7:00 a.m., he learned from the radio that he was wanted for murder. While driving back to Kinston on Highway No. 11, he was stopped by a State trooper, who brought him to the Lenoir County Sheriff's Department.

At no time did defendant tell the officers he shot Stocks. He said that if he shot Stocks he should be punished for it, but he didn't recall shooting anyone that day.

Testimony by SBI agents tended to show that the rifle, the eight spent cartridges which the officers found at the scene of the shooting, the shirt Stocks was wearing at the time he was shot, and the bullet removed from the body of deceased were, in due course, all delivered to the SBI Laboratory in Raleigh. There they were examined by ballistics expert E. P. Pierce. In his opinion the bullet removed from Stocks's shoulder had been fired from the rifle and seven of the eight bullets which Deputy Sheriff Garris had found beside Stocks's automobile had also been fired from that rifle. (The eighth bullet showed insufficient markings to make an identification.) In addition, his microscopic and chemical examination of the shirt Stocks was wearing at the time he was shot revealed a concentration of powder around the hole on the left pocket similar to

State v. Hoffman

the concentration left by that same rifle when it fired a .22-caliber, long-rifle ammunition into blotters.

Further facts pertinent to this decision will be discussed in the opinion.

*Robert Morgan, Attorney General, Charles A. Lloyd, Associate Attorney, for the State.*

*Hodges & Rochelle by James A. Hodges, Jr., for defendant appellant.*

SHARP, Justice.

Defendant brings forward four assignments of error. The first is to the court's refusal to grant his motion for nonsuit made at the conclusion of the State's evidence. The rule, succinctly stated by Justice Higgins in *State v. Stephens,* 244 N.C. 380, 383, 93 S.E. 2d 431, 433 (1956), is as follows:

"Taking the evidence in the light most favorable to the State, if the record here discloses substantial evidence of all material elements constituting the offense for which the accused was tried, then this court must affirm the trial court's ruling on the motion. The rule for this and for the trial court is the same whether the evidence is circumstantial or direct, or a combination of both."

[1] The record here contains plenary evidence that defendant, after threatening to do so, and procuring a rifle for the purpose, on 21 October 1970 shot and killed Stocks with malice, premeditation, and deliberation. His motion for nonsuit was, therefore, properly overruled. *State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484 (1969).

The second assignment which defendant argues is that the judge erred in denying defendant's motion to suppress the testimony of Mrs. Gene Autry Stocks, Mrs. Thelma Barfield, Mrs. Bertie Croombs, and Mrs. Rebecca Moore. Defendant based his motion on the following facts:

On or about 15 March 1971 counsel for defendant moved in writing before Judge Cohoon that the solicitor be directed to furnish defendant's attorney a list of all witnesses whom the State intended to produce at defendant's trial. Judge Cohoon, after ascertaining that the solicitor had no objection to furnish-

ing the names of the persons the State then proposed to call as witnesses, orally directed that he give defendant the requested information. Deputy Sheriff Garris immediately prepared and delivered to defendant's attorney a handwritten list which omitted the names of Mrs. Stocks, Mrs. Barfield, Mrs. Moore, and Mrs. Croombs.

At the beginning of the trial the State called Mrs. Stocks as its first witness. Defendant moved to suppress her testimony and that of any other person called whose name had not been on the list. After hearing the motion, Judge Godwin entered an order in which he found, in addition to the facts set out in the preceding paragraph, that the State now proposed to call, *inter alia,* Mesdames Stocks, Barfield, Moore and Croombs; that defendant's motion before Judge Cohoon was not made under G.S. 8-74; that the State's failure to furnish defendant with the name of every person sworn as a witness when the case was called for trial, and whose testimony it then proposed to use, had not prevented defendant from making full and proper preparation for his trial. Whereupon he denied defendant's motion to suppress, and thereafter the four women above named testified. Defendant excepted but did not move to continue the case.

[2] "The common law recognized no right of discovery in criminal cases." *State v. Goldberg,* 261 N.C. 181, 191, 134 S.E. 2d 334, 340 (1964). In the absence of a statute requiring the State to furnish it, the defendant in a criminal case is not entitled to a list of the State's witnesses who are to testify against him. *McDaniel v. State,* 191 Miss. 854, 4 So. 2d 355 (1941); *Padgett v. State,* 64 Fla. 389, 59 So. 946 (1912); *State v. Matejousky,* 22 S.D. 30, 115 N.W. 96 (1908); 21 Am. Jur. 2d *Criminal Law* § 328 (1965); 16 C.J.S. *Criminal Law* § 2030 (1938). There is no such statute in this State.

[3] Defendant, however, claims that G.S. 8-74 gives him the right to a list of the State's witnesses. This statute, however, provides for taking the deposition of an incapacitated defense witness, "whose name must be given" to the court. Patently this section has no application to defendant's motion.

Although defendant was not entitled to the list as a matter of right, Judge Godwin found that an order to furnish it had been made and that the State had purported to comply with it.

State v. Hoffman

Thus, the question presented is whether the omission of the names of Mrs. Stocks, Mrs. Barfield, Mrs. Moore and Mrs. Croombs prejudiced defendant's defense and deprived him of a fair trial.

Defendant contends that he was prejudiced because the testimony of these four witnesses supplied the sole evidence of motive, premeditation and deliberation. Certainly these witnesses gave material evidence tending to show essential elements of the crime with which defendant was charged. Notwithstanding, a defendant is not legally prejudiced merely because the State proves its case against him.

As stated by the Kentucky Court of Appeals in *Evans v. Commonwealth*, 230 Ky. 411, 19 S.W. 2d 1091 (1929), prejudicial surprise results from events "not reasonably to be anticipated or perhaps testimony contrary to a prior understanding between the parties or something resulting from fraud or deception." *Id.* at 415-16, 19 S.W. 2d at 1093. Neither the presence nor testimony of these four women—the wife of deceased, his mother, his sister-in-law, and a family friend of both defendant and deceased—could have taken defendant by surprise.

[4] Defendant suggests, however, that had he known the ladies were to testify, he might have found "possible rebuttal witnesses" or searched for ground upon which to impeach their credibility. Had there been a reasonable probability of finding such witnesses or grounds, a motion for a continuance would have been appropriate. Defendant's motion, however, was to suppress the testimony of the witnesses, whatever it might be, and not to continue the trial so that he would have an apportunity to disprove it.

[5] The record fails to show that defendant's defense was prejudiced by the omission of the four names from the list furnished him. Permitting these witnesses to testify was a matter in the discretion of the trial judge, not reviewable on appeal in the absence of a showing of abuse. *State v. Anderson*, 281 N.C. 261, 188 S.E. 2d 336 (1972). No abuse of discretion appears.

[6] The third question raised by defendant's assignments of error is the legality of the officers' entrance into his residence during the late afternoon of 21 October 1970 and the seizure

of the .22-caliber rifle found therein. He contends that both the entry and seizure were unlawful and, in consequence, neither the rifle nor the ballistic tests made with it were admissible in evidence. Upon defendant's objection to any testimony involving the rifle, Judge Godwin held a *voir dire* in which he heard the evidence summarized within the brackets and also a substantial portion of the applicable testimony which was later given in the presence of the jury. He then found facts in accordance with the evidence and concluded that the officers had reasonable grounds to believe defendant was concealed in the house. He held that their entry and subsequent seizure of "plain-view" items were legal and overruled defendant's objection in the evidence. In this ruling we find no error.

G.S. 15-44 (1965) provides: "If a felony . . . has been committed, or a dangerous wound has been given and there is reasonable ground to believe that the guilty person is concealed in a house, it shall be lawful for any sheriff . . . or police officer, admittance having been demanded and denied, to break open the door and enter the house and arrest the person against whom there shall be such ground of belief."

[6, 7] Indubitably Stocks had been murdered and the officers had reasonable grounds to believe that defendant had committed the murder. About 1:15 p.m. on the day of the murder, officers had gone to defendant's home, but when he did not answer their calls, they had left without entering. The thrust of defendant's argument is that Judge Godwin should not have believed Whaley's testimony that between 3:30 and 4:00 p.m. he saw the kitchen curtains move. This testimony was not inherently incredible and was sufficient to support the court's findings. They are, therefore, binding on appeal. *State v. Roseman,* 279 N.C. 573, 184 S.E. 2d 289 (1971). Reasonable grounds for belief can be based upon information given to an officer by another, "the source of such information being reasonably reliable." *State v. Roberts,* 276 N.C. 98, 107, 171 S.E. 2d 440, 445 (1969). Further, the fact that silence greeted the officers' demands for entrance and that defendant was not found in the house did not make their entry illegal.

[8] Being lawfully in defendant's residence, the officers could examine and, without a warrant, seize " 'suspicious objects in plain sight' . . . . If the officers' presence was lawful the observation and seizure of what was then and there apparent could

State v. Hoffman

not in itself be unlawful." *State v. Howard,* 274 N.C. 186, 202, 162 S.E. 2d 495, 505-06 (1968) ; *Accord, State v. Harvey,* 281 N.C. 1, 187 S.E. 2d 706 (1972) ; *State v. Virgil,* 276 N.C. 217, 172 S.E. 2d 28 (1970) ; *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376 (1968). The rifle, the bullet which was removed from Stocks's body, and the testimony of ballistics expert Pierce that in his opinion the bullet was fired from the rifle were, therefore, properly admitted in evidence. The assignments of error upon which defendant bases his third proposition are overruled.

Defendant's final assignment of error is that the court erred in admitting the statements which he made to Deputy Sheriff Garris and SBI Agent Campbell as a result of their in-custody interrogation of him.

On *voir dire,* upon plenary supporting evidence, Judge Godwin found facts which show that both Garris and Campbell fully advised defendant of all his constitutional rights in strict compliance with all *Miranda* requirements; that after being thus warned defendant freely, voluntarily, understandingly, and without being induced by threats or promises, specifically waived his constitutional right to remain silent and to have counsel present when he talked to the officers. Upon these findings, Judge Godwin overruled defendant's objections, and admitted his statements to the officers in evidence.

On appeal, defendant makes no contention that he did not orally waive the presence of counsel at his interrogation, or that he did not voluntarily submit to the officers' questioning. The evidence shows that he did both. Thus, the admission of his statements involves no federal constitutional question. *See State v. Lynch,* 279 N.C. 1, 13-14, 181 S.E. 2d 561, 569 (1971) ; *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971) ; *State v. Blackmon,* 280 N.C. 42, 185 S.E. 2d 123 (1971).

[9] Defendant's contention is that at the time of his interrogation he was an indigent, in custody on a capital charge; and that, under G.S. 7A-457 (a) (1969), as it read on 22 October 1970, he could not waive his right to counsel at an in-custody interrogation either orally or in writing. This contention is untenable, for the record affirmatively discloses that at the time of his interrogation defendant had funds, immediately available and adequate, with which to employ counsel to provide

the legal advice he then needed. The admissibility of defendant's statements to the officers was not, therefore, affected by G.S. 7A-450 to -459 (1969). The statements were competent evidence and defendant's assignments of error relating to their admission are overruled.

An indigent person for whom the State must provide counsel is defined by G.S. 7A-450(a) as "a person who is financially unable to secure legal representation and to provide all other necessary expenses of representation in an action or proceeding enumerated in this subchapter." Section (c) of this same statute provides: "The question of indigency may be determined or redetermined by the court at any stage of the action or proceeding at which an indigent is entitled to representation." G.S. 7A-455(a) (1969) requires the court, if it is of the opinion that "an indigent person is financially able to pay a portion, but not all, of the . . . necessary expenses of representation (to) order the partially indigent person to pay such portion to the clerk of superior court for transmission to the State treasury."

The foregoing statutes clearly manifest the legislative intent that every defendant in a criminal case, to the limit of his ability to do so, shall pay the cost of his defense. It is not the public policy of this State to subsidize any portion of a defendant's defense which he himself can pay. An indigent is not one who lacks sufficient funds over and above his homestead and personal property exemptions and his pre-existing debts and obligations to pay the total costs of his defense from beginning to end. An indigent is one who does not have available, at the time they are required, adequate funds to pay a necessary cost of his defense.

At the time of defendant's arrest, according to his sworn statement, he had $160.00 in the bank. He owed no debts except the monthly payments on his 1971 Chevrolet Nova. We take judicial notice that for a fee of less than $160.00 defendant could have obtained counsel for the purpose of advising him with reference to the course of conduct which would serve his best interest at that time. In short, he could pay for the legal services he needed on the morning of his arrest. His ability to pay the costs of subsequent proceedings was not then a question. That was a matter to be determined when that question arose.

State v. Hoffman

Upon defendant's request for counsel and his affidavit of indigency, the district court assigned counsel, who represented him at his preliminary hearing and at his trial in the superior court, and the State paid counsel's fee. We note, however, that this appeal is not at State expense and that defendant was able to post bond for the costs. Prima facie, it was for such situations as this that G.S. 7A-450 (c) was enacted.

The decision here is not in conflict with *State v. Wright,* 281 N.C. 38, 187 S.E. 2d 761 (1972). In that case, at the time of his arrest, the defendant had $5.00 in cash, an automobile on which he was paying $56.00 per month, and two recently purchased government bonds. These bonds, which had cost $18.75 each, were in his mother's possession in Ohio, unavailable even if adequate. The amount of his equity in the automobile was not disclosed, and it was immaterial at that time. The defendant, under arrest for three serious felonies, one of which was rape, was in no position to negotiate either a mortgage or a sale of his automobile. As a practical matter he had only $5.00 with which to meet the immediate emergency, and that was not enough to secure the advice of counsel which he needed then and there. At the time the defendant Wright was interrogated he was, in truth and in fact, an indigent; defendant Hoffman was not.

In the trial below we find

No error.

Justice HIGGINS concurring in result.

I cannot agree with that part of the opinion which intimates that if a defendant is able to employ counsel for the purpose of advising him, or being with him at the interrogation, that he is not an indigent within the meaning of § 7A-451 of the General Statutes.

The entitlement begins when the defendant is taken into custody or served with initiating process and continues through all critical stages including reviews by appeal. The statute does not contemplate that separate counsel may be appointed for each successive step in the trial, but I think contemplates that the same counsel will continue from beginning to end subject

to the right of the court to excuse or allow substitution of counsel at any proper state.

"Entitlement continues through any critical stage of the action or proceeding including identification procedure, preliminary hearing, trial, sentencing, and review." These are specifically stated in § 7A-451.

I concur in result.